## McMULLEN v. HOFFMAN.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 271.   Argued April 27, 28, 1899. — Decided May 22, 1899.

The city of Portland, in Oregon, proposing to receive bids for the construction of what was called the Bull Run pipe line, Hoffman of Portland and McMullen of San Francisco entered into a contract in writing as follows: " This agreement, made and entered into by and between Lee Hoffman, of Portland, Oregon, doing business under the name of Hoffman & Bates, party of the first part, and John McMullen, of San Francisco, California, party of the second part, witnesseth: That, whereas, said Hoffman and Bates have with the assistance of said McMullen at a recent bidding on the work of manufacturing and laying steel pipe from Mount Tabor to the head works of the Bull Run water system for Portland, submitted the lowest bid for said work, and expect to enter into a contract with the water committee of the city of Portland for doing such work, the contract having been awarded to said Hoffman and Bates on said bid: It is now hereby agreed that said Hoffman and said McMullen shall and will share in said contract equally, each to furnish and pay one half of the expenses of executing the same, and each to receive one half of the profits or bear and pay one half of the losses which shall result therefrom.   And it is further hereby agreed that if either of the parties hereto shall get a contract for doing or to do any other part of the work let or to be let by said committee for bringing Bull Run water to Portland, the profits and losses thereof shall in the same manner be shared and borne by said parties equally, share and share alike."   Both put in bids for the work which forms the subject of dispute in this case. Hoffman's bid was for $465,722.   McMullen's was $514,664.   There were several other bids, but Hoffman's was the lowest of all.   The contract was awarded to him.   He did the work and received the pay.   This

action was brought by McMullen to recover his portion of the profit, according to the contract. *Held*, that this contract was illegal, not only as tending to lessen competition, but also because the parties had committed a fraud in combining their interests and concealing the same, and in submitting the different bids as if they were *bona fide*, and that the court will not lend its assistance in any way towards carrying out the terms of an illegal contract, nor will it or any court enforce any alleged rights directly springing from such a contract.

While distinguishing *Brooks* v. *Martin*, 2 Wall. 70, from this case, the court holds that, taking that case into due consideration, it will not extend its authority at all beyond the facts therein stated.

THIS action was originally brought by the complainant McMullen against one Lee Hoffman, and he having died before the trial, the action was revived against the defendant Julia E. Hoffman, as the executrix of his will. When the defendant is hereinafter spoken of, the original defendant is intended.

The complainant filed his bill against the defendant, seeking an accounting of profits that he alleged had been made by the defendant upon a certain contract for the construction of what is termed the Bull Run pipe line, and which contract was entered into between the city of Portland, in the State of Oregon, and the defendant on or about March 10, 1893. The complainant bases his right to share in the profits of that contract by virtue of another contract in writing between himself and the defendant herein, executed March 6, 1893. That agreement reads as follows:

" This agreement, made and entered into by and between Lee Hoffman, of Portland, Oregon, doing business under the name of Hoffman & Bates, party of the first part, and John McMullen, of San Francisco, California, party of the second part, witnesseth: That, whereas, said Hoffman and Bates have with the assistance of said McMullen at a recent bidding on the work of manufacturing and laying steel pipe from Mount Tabor to the head works of the Bull Run water system for Portland, submitted the lowest bid for said work, and expect to enter into a contract with the water committee of the city of Portland for doing such work, the contract having been awarded to said Hoffman and Bates on said bid;

"It is now hereby agreed that said Hoffman and said Mc-Mullen shall and will share in said contract equally, each to furnish and pay one half of the expenses of executing the same, and each to receive one half of the profits or bear and pay one half of the losses which shall result therefrom.

"And it is further hereby agreed that if either of the parties hereto shall get a contract for doing or to do any other part of the work let or to be let by said committee for bringing Bull Run water to Portland, the profits and losses thereof shall in the same manner be shared and borne by said parties equally, share and share alike.

"Witness our hands and seals this 6th day of March, A. D. 1893.

> "JOHN McMULLEN. [SEAL.]
> "LEE HOFFMAN. [SEAL.]"

The contract for manufacturing and laying the steel pipe was awarded to the defendant at a public letting of the whole work at Portland, of which the manufacturing and laying of the pipe was a part, and the whole work was divided into classes, and separate bids called for and received for each class.

The defendant put in bids in the name of Hoffman & Bates for several classes, while the plaintiff, in the name of the San Francisco Bridge Company, (of which he was an officer,) put in separate bids for the same classes.

The bids of complainant and defendant for the several classes of the work were as follows:

Conduit from head works to Mount Tabor of wrought iron or steel, making and laying pipe:

Hoffman & Bates............................ $465,722 00
San Francisco Bridge Company............... 514,664 00

(The profits arising out of this contract are the subject of the controversy herein.)

Head works—
Hoffman & Bates............................ $17,800 00
San Francisco Bridge Company............... 16,550 00

Bridges —
Hoffman & Bates.............................. $33,562 94
San Francisco Bridge Company................:...... 31,279 07

    Also for steel conduit for head works to Mount Tabor —
Hoffman & Bates............................. $359,278 00
San Francisco Bridge Company................ 348,781 00

There were several other bids by different bidders for these various classes. The bid in the name of Hoffman & Bates for the manufacture and laying of the wrought iron or steel pipe from the head works to Mount Tabor being $465,722, was the lowest out of eight bids, the various bids from the highest to the lowest being as follows:

The Risdon Iron & Locomotive Works.......... $600,737 00
The Bullon Bridge Company..................... 533,507 00
Oscar Huber................................... 521,775 40
San Francisco Bridge Company.............. 514,664 00
Wolff, Buener & Zwicker.................... 495,682 00
Ferry Hinckle & Robert Wakefield............ 481,040 00
E. W. Jones & O. W. Wagner................ 477,552 00
Hoffman & Bates............................ 465,722 00

All these bids were before the committee on the part of the city and were taken into consideration at the time the award was made to the defendant. After the acceptance of his bid for the manufacturing and laying of the pipe, the defendant entered into a contract with the city of Portland to do the work mentioned in such bid, and commenced the performance of the contract as provided for therein. The work was duly completed and the city paid defendant the contract price for the same, retaining the percentage provided for therein, as security that the terms of the contract had been fully complied with.

The complainant alleges that defendant, after securing the contract, went on with the work thereunder, but refused to permit him to participate in the profits arising therefrom or to examine the books of the partnership, and that although he (complainant) furnished some of the capital and performed

some of the services provided for in the contract with the city, and participated in some of the expenses of the execution of the contract, and devoted some of his time and attention to the proper performance thereof, and was at all times ready to do everything required of him by his agreement of partnership, yet that the defendant received all the moneys paid by the city and absolutely refused to account to him for any part thereof, and denied that he had any interest in or right to any portion of such moneys. The complainant, therefore, asked for an accounting between himself and defendant, as partners, and for a decree for the payment to him of one half the profits arising from the contract, the whole of which he alleged amounted to $80,000, (the courts below say the evidence shows they were $140,000;) that a receiver might be appointed to take charge of the property of the partnership, its records, books, papers, etc., and that the defendant might be restrained during the pendency of the suit from making sale or other disposition of the tools, equipment or other personal property belonging to the partnership, and from drawing from the city of Portland the moneys withheld by it on account of the contract, as well as any other money due for other work done by the defendant under the contract of partnership.

The answer of the defendant, while denying many of the allegations of the complaint, set up as a special defence the making of an agreement between the parties, (of which the partnership agreement was a portion,) by the terms of which they were to put in bids for the construction of the work, the complainant in the name of the San Francisco Bridge Company and the defendant in the name of Hoffman & Bates; that the bids should not be in reality competitive, but should be submitted to each other before they were put in, and their terms should be mutually agreed upon, the higher bids to be merely formal, and the bids themselves as agreed upon should be delivered to the water committee; that if either party received the contract, they should both share in the profit or loss resulting from its performance, but that their mutual interest in each other's bids should not be made known when the bids were offered, so that it would appear that they were apparently

competing for the various classes of the work and for furnishing the material, when in fact they were not.   This agreement, the defendant alleged, was carried out, and the contract secured by means thereof.

The court upon motion of the complainant granted a temporary injunction as prayed for in the bill.   Exceptions were taken to certain parts of the answer of the defendant as being insufficient.   Material portions of these exceptions were overruled by the court upon the ground that the answer set up an illegal contract between the parties, and one which could not be enforced by either.   69 Fed. Rep. 509.

Upon the final hearing of the case the same judge, becoming convinced that he had erred in his former decision in overruling the exceptions to the answer, decided that the case as made on the part of the defendant showed no defence to the complainant's cause of action, and thereupon he made a decree for an accounting substantially as asked for in the complainant's bill. 75 Fed. Rep. 547.

An appeal from the decree of the Circuit Court was taken to the United States Circuit Court of Appeals for the Ninth Circuit, and that court held that the contract between the parties was illegal, and that no action could be maintained thereon by either, and the decree in favor of the complainant was therefore reversed.   48 U. S. App. 596.   Complainant then applied to this court for a writ of certiorari to review the judgment of the Circuit Court of Appeals, which was granted May 9, 1898.   170 U. S. 705.

*Mr. L. B. Cox* and *Mr. William A. Maury* for petitioner. *Mr. R. Percy Wright* was on their brief.

*Mr. Rufus Mallory* for respondent.

MR. JUSTICE PECKHAM, after stating the facts, delivered the opinion of the court.

The foregoing statement shows that there is a difference of opinion in the courts below as to the law applicable to the

case. The question is one of importance, involving as it does the principles which should control in regard to the procurement of contracts at public lettings for work to be awarded to the lowest bidder. Assuming the same facts, the courts below have come to opposite conclusions upon the character of the contract and upon the right of the complainant to obtain redress for his alleged wrongs.

It was on account of the general importance of the question and the many lettings for public works by the Government and by municipal corporations which are affected by the law relative to bidding, that this court thought it a proper case to issue the writ of certiorari herein. The cases upon the subject are not entirely harmonious, and we think it well to again consider some of them and so far as possible to remove the doubts which seemingly have arisen in this branch of the law.

Looking in the record before us, we find that the pleadings and proofs taken herein show that for some time prior to the 6th of March, 1893, the city of Portland intended to add to its water supply by bringing to the city the water from a creek or river called Bull Run, some thirty miles distant, and for that purpose it had issued through its water committee proposals for bids to build the works, which proposals were divided into several different classes as already stated.

The complainant McMullen, living in San Francisco and being a large stockholder in and manager of the San Francisco Bridge Company, came to Portland for the purpose of giving his attention to the matter, and if possible to make an arrangement with the defendant by which they might together become bidders for the work. He and the defendant had many interviews before the time of delivering the bids arrived, and they finally agreed that each party should put in separate bids in his own or his firm name, or in the name of his company, for certain classes of the work, but that they both should have a common interest in each bid if any were accepted. This community of interest was to be kept secret and concealed from all persons, including the water committee. Each was to know the amount of the other's bid, and

all bids were to be put in only after mutual consultation and agreement. Bids for the various classes of work were put in as above set forth, and among them the bid for the manufacture and laying of the pipe, which was accepted by the water committee. All of them were put in pursuant to this agreement, part of them in the name of Hoffman & Bates and part in the name of the San Francisco Bridge Company. The bid in the name of the San Francisco Bridge Company for the manufacture of the pipe was nearly $50,000 higher than the amount bid in the name of Hoffman & Bates, and was put in after consultation with and approval by the defendant. This last bid was put in, as stated by Mr. McMullen in his evidence, as a matter of form only, and to keep the name of his company before the public, but it appeared on its face to be a *bona fide* bid. The water committee received the bids in ignorance of the existence of this agreement and in the supposition that all the bids which were received were made in good faith, and they all received consideration at the hands of the committee. After the computations were made by which it appeared that the bid of the defendant was the lowest for the manufacture and laying of the pipe, the contract was awarded him, and afterwards that portion of the agreement which had been made between the parties to this combination, viz., that relating to the partnership, was reduced to writing, and is set out in the foregoing statement.

Upon these facts the question arising is whether a contract between the parties themselves such as is above set forth is illegal? In order to answer the question we would first naturally ask what is its direct and necessary tendency? Most clearly that it tends to induce the belief that there is really competition between the parties making the different bids, although the truth is that there is no such competition, and that they are in fact united in interest. It would also tend to the belief on the part of the committee receiving the bids that a *bona fide* bidder, seeking to obtain the contract, regarded the price he named, although much higher than the lowest bid, as a fair one for the purpose of enabling him to realize reasonable profits from its performance. A bid thus made

amounts to a representation that the sum bid is not in truth an unreasonable or too great a sum for the work to be done. We do not mean it is a warranty to that effect or anything of the kind, but simply that a committee receiving such a bid and assuming it to be a *bona fide* bid would naturally regard it as a representation that the work to be done, with a fair profit, would, in the opinion of the bidder, cost the amount bid. Hence it would almost certainly tend to the belief that the lower bid was not an unreasonably high one, and that it would be unnecessary and improper to reject all the bids and advertise for a new letting. The fact that there were other bids even higher than that of the San Francisco Bridge Company, for the manufacture and laying of the pipes, does not alter the tendency of the agreement when carried into effect, to create or to strengthen the belief on the part of the committee in the fact of an active competition and the *bona fide* character of that competition, and that the lowest bid would be in all probability a reasonable one. It is in truth utterly impossible to accurately or fully predict all the vicious results to be apprehended as the natural effect of this kind of an agreement. It cannot be said in all cases just what the actual effect may have been.

The natural tendency and inherent character of the agreement are also unaffected by any evidence produced on the part of the complainant, that the chairman of the water committee had, when examined nearly three years after the occurrence, no recollection as to the bid of the bridge company or that it had any particular effect upon his mind, and that he said that the contract was awarded to the lowest bidder simply because he was the lowest bidder, and without reference to the bid of the bridge company.

The question is not whether in this particular case any member of the water committee did or did not remember the fact that the bridge company had made a bid or that such bid had no effect upon his mind. The question is not as to the effect a particular act in fact had upon a member of the water committee, but what is the tendency and character of the agreement made between the parties; and that tendency

or character is not altered by proof on the part of a member
of the committee, given several years afterwards, that he had
no special recollection that such a bid had been made.   The
evidence is that all the bids that were given received the con-
sideration of the committee, and there can be no doubt that
the more bids there were, seemingly of a *bona fide* character,
the more the committee would be impressed with the idea that
there was active competition for the work to be done.

It might readily be surmised that if these parties had bid
in competition, one or both of the bids would have been lower
than their combined bid.   It was not necessary, however, to
prove so difficult a fact.   The inference would be natural.

In *Richardson* v. *Crandall*, 48 N. Y. 348, 362, the court
said: "In all cases where contracts are claimed to be void as
against public policy, it matters not that any particular con-
tract is free from any taint of actual fraud, oppression or
corruption.   The laws look to the general tendency of such
contracts.   The vice is in the very nature of the contract, and
it is condemned as belonging to a class which the law will not
tolerate," citing *Atcheson* v. *Mallon*, 43 N. Y. 147.

Although these remarks were made when the court was
dealing with the case of a bond taken *colore officii*, yet the
principle applies equally to a case like the one at bar, and
indeed it is seen that such was the view of the judge deliver-
ing the opinion, since he cited *Atcheson* v. *Mallon*, which in
its nature is a case very similar to the one now before us.

The vice is inherent in contracts of this kind, and its ex-
istence does not in the least depend upon the success which
attends the execution of any particular agreement.

In *Tool Company* v. *Norris*, 2 Wall. 45, 56, the court said,
in speaking as to illegal agreements:

"It is sufficient to observe, generally, that all agreements
for pecuniary considerations to control the business operations
of the Government, or the regular administration of justice,
or the appointments to public offices, or the ordinary course
of legislation, are void as against public policy, without refer-
ence to the question whether improper means are contem-
plated or used in their execution."

And in *Rex* v. *De Berenger*, 3 M. & S. 67, 72, cited in *Scott* v. *Brown*, (1892) 2 Q. B. D. 724, 730, Lord Ellenborough, C. J., said:

"A public mischief is stated as the object of this conspiracy; the conspiracy is by false rumors to raise the price of the public funds and securities; and the crime lies in the act of conspiracy and combination to effect that purpose, and would have been complete, although it had not been pursued to its consequences, or the parties had not been able to carry it into effect. The purpose itself is mischievous; it strikes at the price of a vendible commodity in the market, and if it gives it a fictitious price by means of false rumors, it is a fraud levelled against all the public, for it is against all such as may possibly have anything to do with the funds on that particular day."

Contracts of the nature of this one are illegal in their nature and tendency, and for that reason no inquiry is necessary as to the particular effect of any one contract, because it would not alter the general nature of contracts of this description or the force of the public policy which condemns them.

In the case at bar the illegal character of the agreement is founded not alone upon the fact that it tends to lessen competition, but also upon the fact of the commission of a fraud by the parties in combining their interests and concealing the same, and in submitting different bids as if they were *bona fide*, when they knew that one of them was so much higher than the other that it could not be honestly accepted, and when they put it in for the sake of keeping up the form and of strengthening the idea of a competition which did not in fact exist. The tendency of such agreements is bad, although in some particular case it might be difficult to show that it actually accomplished a fraud, while its intention to do so would be plain enough. Therefore, when it is urged that these parties had no intention of bidding for this work alone, and that unless they had combined their bids neither would have bid at all, and hence the agreement between them tended to strengthen instead of to suppress competition, this answer to

the illegality of the transaction is insufficient. The evidence, however, does not show that if these parties had not agreed upon a combination neither would have bid alone. It shows the complainant came to Portland to see the defendant and to conclude their arrangements to go into the combination, but we are by no means of the opinion that the evidence shows that if they had not combined they would not have bid at all. Complainant's company had bid alone at a prior letting, some time before, and had then been the lowest bidder for the contract, which the city did not award because of a lack of means of payment for the work consequent upon a veto by the governor of the bill providing for the issuing of bonds to make such payment. And it seems that the defendant himself was well able to carry on the contract alone.

If it be granted that the fact was proved that neither party would have bid separately, and that by virtue of the combination a bid was made which otherwise would not have been offered, the significance of the other facts in the case is not thereby altered. Those other facts are the concealment of the interest which the parties had in each other's bids, and the making of what were under the circumstances nothing more than fictitious bids for this and the other classes of work for which both parties put in bids, evidently for no other purpose than to endeavor thereby to deceive the committee into believing that there was real competition between them, when in fact there was none. If there had been competition, the bid of each for the contract that was obtained might very likely have been lower than the one that was accepted. It is not necessary to prove that fact in order to show the nefarious character of the agreement.

The reason given for the making of these fictitious bids by the complainant, that it was a formal matter and to keep the name of his company before the public, is entirely inadequate. The bids actually put in by them for the other classes of work had the same tendency to strengthen belief in the reality of the competition which in fact did not exist between these persons. The whole transaction was intentionally presented to the water committee in a false and deceptive light.

Upon general principles it must be apparent that biddings for contracts for public works cannot be surrounded with too many precautions for the purpose of obtaining perfectly fair and *bona fide* bids. Such precautions are absolutely necessary in order to prevent the successful perpetration of fraud in the way of combinations among those who are ostensible rivals, but who in truth are secretly banded together for the purpose of obtaining contracts from public bodies such as municipal and other corporations at a higher figure than they otherwise would. Just how the fraud is to be successfully worked out by the combination, it is not necessary to show. It is enough to see what the natural tendency is. Public policy requires that officers of such corporations, acting in the interest of others, and not using the sharp eye of a practical man engaged in the conduct of his own business, and not controlled by the powerful motive of self-interest, should, so far as possible and for the sake of the public whom they represent, be protected from the dangers arising out of a concealed combination and from fictitious bids.

To hold contracts like the one involved in this case illegal is not to create any new rule of law for the purpose of affording the protection spoken of. It is but enforcing an old rule, and applying it to such facts as exist in this case because it naturally fits them. Its enforcement here is to but carry into effect the public policy upon which the rule itself is founded. People who have been guilty of the conduct exhibited in this record cannot be heard to say that although their arrangement was fraudulent and illegal, they would nevertheless have obtained the contract even if they had not been guilty of the fraud, because the bids show they were the lowest bidders. The bids might have been lower yet if there had been competition where there was in fact combination. The parties must accept the consequences resulting from entering into the agreement proved in this case, all of which they carried out, and included in which and as a consequence thereof was the agreement with the city and the written agreement of partnership between themselves.

In *Hyer* v. *Richmond Traction Company*, 168 U. S. 471, in

speaking as to the character of the agreement in that case, Mr. Justice Brewer remarked that the vice of a combination "lies in the fact of secrecy, concealment and deception; the one applicant, though apparently antagonizing the other, is really supporting the latter's application, and the public authorities are misled by statements and representations coming from a supposed adverse, but in fact friendly, source."

In that case the demurrer admitted the allegation of the complaint that the combination of the two interests asking for the concession from the common council was known and announced to that body before its decision was made. The case simply shows the part which concealment takes in a combination, being in fact one of the great dangers springing therefrom.

In *Atcheson* v. *Mallon*, 43 N. Y. 147, 151, Judge Folger, in delivering the opinion of the court, said:

"But a joint proposal, the result of honest coöperation, though it might prevent the rivalry of the parties, and thus lessen competition, is not an act forbidden by public policy. Joint adventures are allowed. They are public and avowed, and not secret. The risk, as well as the profit, is joint, and openly assumed. The public may obtain at least the benefit of the joint responsibility, and of the joint ability to do the service. The public agents know, then, all that there is in the transaction, and can more justly estimate the motives of the bidders, and weigh the merits of the bid."

We have here nothing to do with a combination of interest which is open and avowed, which appears upon the face of the bid and which is therefore known to all. Such a combination is frequently proper, if not essential, and, where, no concealment is practised and the fact is known, there may be no ground whatever for judging it to be in any manner improper.

But in this case there is more even than concealment. There is the active fraud in the putting in of these, in substance, fictitious bids, in their different names, but in truth forming no competitive bids, and put in for the purpose already stated. It is not too much to say that the most perfect

good faith is called for on the part of bidders at these public lettings, so far as concerns their position relating to the bids put in by them or in their interest. The making of fictitious bids under the circumstances detailed herein is in its essence an illegal and most improper act; indeed, it is a plain fraud, perpetrated in the effort to obtain the desired result.

The evidence shows that this written partnership agreement was only a part of the entire agreement existing between the parties. That agreement covered and was clearly intended to cover their whole action from the time they agreed to put in their bids in a common interest up to and including the execution and performance of the contract obtained from the city. The agreement (of which that for a partnership was but a portion) was that they should combine their interests; that they should put in bids known to each; that they should conceal the fact of their combination; that they should put in fictitious bids without expectation or purpose of having them taken; that if the contract were procured they should perform the work as partners and share expenses and divide profits. No division of that contract into two periods, the one prior and the other subsequent to the written agreement between the parties, can be made. The complainant cannot count only upon the contract of partnership as evidenced by the writing of March, 1893. That writing evidenced only a portion of the agreement that had been made between these parties, the result being that, although their agreement was in the first instance by parol, a portion of it was subsequently reduced to writing. The whole contract is none the less one and indivisible, just as much as if it had all been put in writing. If it had been, it would scarcely be argued that complainant might maintain an action by relying on that part of it which was valid and relating to the partnership between them, and that he might discard or omit to prove that portion which was illegal. If the complainant did not, the defendant could, prove the whole contract, as well the part lying in parol as that which was reduced to writing, so that the court might, upon an inspection of the whole contract, determine therefrom its character. The unity of the

contract is not severed or its meaning or effect in any degree altered by putting part of it in writing and leaving the rest in parol.

Concluding as we do that this agreement between these parties is as a whole of an illegal nature, and that the portion thereof which is reduced to writing cannot be separated from the balance of the agreement, the question then arises as to the result of such conclusion upon the parties to the agreement.

There are several old and very familiar maxims of the common law which formulate the result of that law in regard to illegal contracts. They are cited in all law books upon the subject and are known to all of us. They mean substantially the same thing and are founded upon the same principles and reasoning. They are: *Ex dolo malo non oritur actio ; Ex pacto illicito non oritur actio ; Ex. turpi causa non oritur actio.* About the earliest illustration of this doctrine is almost traditional in the famous case of *The Highwayman.* It is stated that Lord Kenyon once said, by way of illustration, that he would not sit to take an account between two robbers on Hounslow Heath, and it was questioned whether the legend in regard to the highwayman did not arise from that saying. It seems, however, that the case was a real one. He did file a bill in equity for an accounting against his partner, although it was no sooner filed and its real nature discovered than it was dismissed with costs, and the solicitors for the plaintiff were summarily dealt with by the court as for a contempt in bringing such a case before it. (1 Lindley on Partnership, 5th ed. 94, note *n ;* 9 Law Quarterly Review, (London) pp. 105–197.)

The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract. In cases of this kind the maxim is *Potior est conditio defendentis.*

· The following are only a few of the numerous cases upon the subject in England and in this country : *Holman* v. *Johnson*, (1775) 1 Cowper, 341 ; *Booth* v. *Hodgson*, (1795) 6 T. R. 405 ; *Thomson* v. *Thomson*, (1802) 7 Ves. 468 ; *Shiffner* v. *Gordon*, (1810) 12 East, 296 ; *Sykes* v. *Beadon*, (1879) L. R. 11 Ch. Div. 170 ; *Scott* v. *Brown*, (1892) 2 Q. B. D. 724 ;. *Belding* v. *Pitkin*, (1804) 2 Caines, 147*a* ; *Atcheson* v. *Mallon*, (1870) 43 N. Y. 147 ; *Leonard* v. *Poole*, (1889) 114 N. Y. 371 ; *Wheeler* v. *Russell*, (1821) 17 Mass. 258, 281 ; *Snell* v. *Dwight*, (1876) 120 Mass. 9 ; *Marshall* v. *Baltimore & Ohio Railroad Co.*, (1853) 16 How. 314, 334 ; *McBlair* v. *Gibbes*, (1854) 17 How. 232 ; *Coppell* v. *Hall*, (1868) 7 Wall. 542 ; *Trist* v. *Child*, (1874) 21 Wall. 441, 448 ; *Woodstock Iron Company* v. *Richmond & Danville Extension Co.*, (1888) 129 U. S. 643 ; 1 Lindley on Partnership, 5th ed. 93, note, giving the result of the American cases.

The general proposition is not disputed, but certain explanations as to its meaning and extent have been announced by the courts in cases now to be referred to, and the effort has been to show that the case before us comes under some of the exceptions to the rule, and ought not to be governed by the so-called harshness of the rule itself.

If the partnership agreement that is contained in the writing above set forth is in truth but part of an entire agreement, which contains utterly illegal provisions, then this action cannot be maintained within any of the authorities.

It is only by proving the partnership agreement as an entire agreement, separate and free from the balance of the agreement between the parties, that argument can be made in favor of its validity. It has been sometimes said that where a contract, although it be illegal, has been fully executed between the parties so that nothing remains thereof for completion, if the plaintiff can recover from the defendant moneys received by him without resorting to the contract, the court will permit a recovery in such case. The cases cited as illustrating the exception are, among others, *Tenant* v. *Elliott*, (1797) 1 Bos. & Pul. 2 ; *Farmer* v. *Russell*, (1798) 1 Bos. & Pul. 295 ; *Sharp* v. *Taylor*, (1849) 2 Phil. Ch. 801, 817 ;

*Armstrong* v. *Toler*, (1826) 11 Wheat. 258, 269; *McBlair* v. *Gibbes, supra,* 17 How. 232, 235; *Brooks* v. *Martin,* (1863) 2 Wall. 70; *Planters' Bank* v. *Union Bank,* (1872) 16 Wall. 483; *Armstrong* v. *American Exchange National Bank of Chicago,* (1889) 133 U. S. 433, 466.

Upon the point as to the ability of the plaintiff to make out his cause of action without referring to the illegal contract, it may be stated that the plaintiff for such purpose cannot refer to one portion only of the contract upon which he proposes to found his right of action, but that the whole of the contract must come in, although the portion upon which he founds his cause of action may be legal. *Booth* v. *Hodgson,* 6 T. R. 405, 408; *Thomson* v. *Thomson,* 7 Ves. 468; *Embrey* v. *Jemison,* 131 U. S. 336, 348.

In the first of the above cases the plaintiff sought to maintain his action by referring to that part of the contract which was not illegal, and to ask a recovery upon that alone. Lord Kenyon, Chief Justice, observed that it seemed to be admitted by counsel for plaintiff "That if the whole case were disclosed to the court there was no foundation for the demand. They say to the court, 'suffer us to garble the case, to suppress such parts of the transaction as we please, and to impose that mutilated state of it on the court as the true and genuine transaction, and then we can disclose such a case as will enable our clients to recover in a court of law.' Such is the substance of this day's argument. It is a maxim in our law that a plaintiff must show that he stands on a fair ground when he calls on a court of justice to administer relief to him."

Mr. Justice Ashhurst, in the same case, said: "The plaintiffs wish us to decide this case on a partial statement of the facts, thereby admitting that if the whole case be disclosed they have no prospect of success; but we must take the whole case together, and upon that the plaintiffs cannot recover."

Mr. Justice Grose said: "We cannot decide on a part of the case; and taking the whole together, an assumpsit cannot be raised from one part of the case when the other parts

of it negative an assumpsit." The defendant therefore had judgment.

In *Thomson* v. *Thomson, supra,* the plaintiff was not permitted to recover, because he had no claim to the money except through the medium of an illegal agreement. The Master of the Rolls (Sir William Grant) said: "If the case could have been brought to this, that the company had paid this into the hands of a third person for the use of the plaintiff, he might have recovered from that third person; who could not have set up this objection (the illegality of the contract) as a reason for not performing his trust. *Tenant* v. *Elliott* is, I think, an authority for that. But in this instance it is paid to the party; for there can be no difference as to the payment to his agent. Then how are you to get at it, except through this agreement. There is nothing collateral; in respect of which, the agreement being out of the question, a collateral demand arises; as in the case of stock jobbing differences. Here you cannot stir a step but through that illegal agreement; and it is impossible for the court to enforce it. I must therefore dismiss the bill."

And in *Embrey* v. *Jemison, supra,* although the action was upon four negotiable notes, the court would not permit a recovery to be had upon them, because the consideration for the notes was based upon a contract which was illegal. Mr. Justice Harlan, in delivering the opinion of the court, said that the plaintiff could not "be permitted to withdraw attention from this feature of the transaction by the device of obtaining notes for the amount claimed under that illegal agreement; for they are not founded on any new or independent consideration, but are only written promises to pay that which the obligor had verbally agreed to pay. They do not, in any just sense, constitute a distinct or collateral contract based upon a valid consideration. Nor do they represent anything of value, in the hands of the defendant, which, in good conscience, belongs to the plaintiff or to his firm. Although the burden of proof is on the obligor to show the real consideration, the execution of the notes could not obliterate the substantive fact that they grew immediately out of, and are directly connected

with, a wagering contract. They must, therefore, be regarded as tainted with the illegality of that contract, the benefits of which the plaintiff seeks to obtain by this suit. That the defendant executed the notes with full knowledge of all the facts is of no moment. The defence he makes is not allowed for his sake, but to maintain the policy of the law," citing *Coppell* v. *Hall,* 7. Wall. 542, 558.

In the latter case Mr. Justice Swayne, delivering the opinion of the court, said :  ·

" Whenever the illegality appears, whether the evidence comes from one side or the other, the disclosure is fatal to the case. No consent of the defendant can neutralize its effect. A stipulation in the most solemn form to waive the objection would be tainted with the vice of the original contract, and void for the same reasons. Wherever the contamination reaches it destroys. The principle to be extracted from all the cases is, that the law will not lend its support to a claim founded upon its violation."

These authorities uphold the principle that the whole case may be shown, and the plaintiff cannot prevent it by proving only so much as might sustain his cause of action, and then objecting that the defendant himself brings in the balance, which it was not necessary for plaintiff to prove.

The cases above cited as illustrative of the exceptions to the general rule also show what is meant by the cause of action. being founded on some new consideration, or upon a contract collateral to the original illegal one.

In *Tenant* v. *Elliott, supra,* it was held that where two persons had entered into an illegal contract in regard to insurance, and a loss having occurred, the insurer paid the money to a third person to be paid to plaintiff, the third person could not himself retain the money because it arose out of an illegal contract. Eyre, Chief Justice, asked, " Whether he who had received the money to another's use on an illegal contract, can be allowed to retain it, and that not even at the desire of those who paid it to him ? "

In such case clearly the defendant had nothing whatever to do with the illegality of the original contract. He received

the money to be paid to another, and when he received it for that purpose he promised, either expressly or by implication arising from the facts, that he would deliver the money to the plaintiff, and when he refused to do it the plaintiff could recover upon this express or implied contract, without resorting in any manner to the original contract between himself and another, which in its nature was illegal, but with which the defendant was in nowise concerned.

*Farmer* v. *Russell, supra,* is to the same effect. The defendant received the money from a third person to deliver to the plaintiff, and it was held that he was bound to pay it to the plaintiff, although the original consideration upon which the money was to be paid the plaintiff by the third person was illegal. Eyre, Chief Justice, said:

"It seems to me that the plaintiff's demand arises simply out of the circumstances of money being put into the defendant's hands to be delivered to him. This creates an *indebitatus,* from which an *assumpsit* in law arises, and on that an action on the case may be maintained. . . . The case therefore is brought to this, that the money is got into the hands of a person who was not a party to the contract, who has no pretence to retain it, and to whom the law could not give it by rescinding the contract. Though the court will not suffer a party to demand a sum of money in order to fulfil an illegal contract, yet there is no reason why the money in this case should not be recovered notwithstanding the original contract was void. The difficulty with me is, that the contract with the carrier cannot be connected with the contract between the plaintiff and the man at Portsmouth, and in that view I think the verdict is not to be supported. However, I incline to a new trial on another ground. It does not clearly appear that the defendant was not himself a party to the original contract; for there was a circumstance in the report which gave much countenance to the idea that the carrier knew what he was doing, viz., that he was lending his assistance to an infamous traffic. In that case, the rule *Melior est conditio possidentis* will apply; for if the contract with him be stained by anything illegal, the plaintiff shall not be heard in a court of law."

The verdict in this case had been for the defendant.

There was a question in the case whether the defendant was privy to the contract between the plaintiff and the man at Portsmouth. The goods transported were counterfeit pennies or half-pence, and it was the opinion of Eyre, Chief Justice, that if the defendant had been privy to the original illegal agreement so that the whole thing was but one transaction, the plaintiff could not have recovered. Mr. Justice Rooke was of opinion that it was not important whether the defendant were privy or not; that if the contract were illegal, the plaintiff could not recover from the defendant in any event. The other two judges were of opinion that the money having been delivered to the defendant for the purpose of being paid to the plaintiff, the defendant was bound to make such payment without reference to the illegality in the original transaction.

The difference in the principle upon which a recovery was allowed in these two cases and that upon which the defence in this case is based is very clear. In the case before us the cause of action grows directly out of the illegal contract, and if the court distributes the profits it enforces the contract which is illegal. But where A claims money from B, although due upon an illegal contract, and B acknowledges the obligation and waives the defence of illegality and pays the money to a third party upon his promise to pay it to A, the third party cannot successfully defend an action brought by A to recover the money by alleging that the original contract between A and B was illegal. This is the principle decided, and we think correctly decided, in the cases cited. It was certainly no business of the third party to inquire into the reasons which impelled the person to give him the money to pay to the plaintiff. That was a matter between those parties, and if the party from whom the money was due admitted his indebtedness and chose to pay it, the defendant, who received it upon his promise to pay the plaintiff, would have no possible defence to an action by the plaintiff to compel such payment. Such an action is in no sense founded upon an illegal contract. That matter was closed when the party

owing the money under it paid it to a third person to be paid to the plaintiff. The action by the plaintiff in such case is founded upon a new contract upon a totally different consideration and of a perfectly legitimate character.

The next case cited by complainant as an authority for the maintenance of this action is *Sharp* v. *Taylor, supra.* It was stated by the Chancellor in that case that where one of two partners had possessed himself of the property of the firm, he could not be allowed to retain it by merely showing that in realizing it some provision of some act of Parliament had been violated or neglected or that some provision of a foreign statute relating to the registry of vessels had not been complied with.

Lord Chancellor Cottenham, in the course of his opinion, said :

"The violation of law suggested was not any fraud upon the revenue, or omission to pay what might be due; but, at most, an invasion of a Parliamentary provision, supposed to be beneficial to the ship owners of this country; an evil, if any, which must remain the same, whether the freight be divided between Sharp and Taylor, according to their shares, or remain altogether in the hands of Taylor. As between these two, can this supposed evasion of the law be set up as a defence by one against the otherwise clear title of the other? In this particular suit, can the one tenant in common dispute the title common to both? Can one of two partners possess himself of the property of the firm, and be permitted to retain it, if he can show that, in realizing it, some provision in some act of Parliament has been violated or neglected? Can one of two partners, in any import trade, defeat the other, by showing that there was some irregularity in passing the goods through the custom house? The answer to this, as to the former case, will be, that the transaction alleged to be illegal is completed and closed, and will not be in any manner affected by what the court is asked to do, as between the parties. Do the authorities negative this view of the case? The difference between enforcing illegal contracts and asserting title to money which has arisen from them, is distinctly taken in

*Tenant* v. *Elliott* and *Farmer* v. *Russell,* and recognized and approved by Sir William Grant in *Thomson* v. *Thomson.* But the alleged illegality in this case was not in the freight being paid to English subjects claiming as owners of the ship, as in *Campbell* v. *Innes.* The importation of the goods in a ship American built, and not professing to have any English registry, would not be illegal, and the American owner might assign the freight to any one : assuming this to be so, I am of opinion that, under the authorities referred to, Taylor, who received the freight on account of himself and Sharp, cannot set up this defence to Sharp's claim. Upon these grounds, therefore, independently of the submission in the answer, this part of the decree is, I think, right."

These observations show that the judgment did not go upon the illegality arising from a mere violation or neglect of a provision of an act of Parliament relating to vessels, and the agreement was not classed among those contracts which are of such an illegal nature that courts refuse to enforce them. Some of the observations of the Chancellor, made by way of illustration regarding the rule itself, have been since doubted by the English courts, as in the case of *Sykes* v. *Beadon, supra,* where Jessel, Master of the Rolls, in holding that an illegal contract could not be enforced by one party to it as against the other, directly or indirectly, said that there were several dicta of Lord Cottenham's in *Sharp* v. *Taylor,* which he thought were not good law, and the Master of the Rolls remarked :

"It is no part of a court of justice to aid either in carrying out an illegal contract, or in dividing the proceeds arising from an illegal contract, between the parties to that illegal contract. In my opinion, no action can be maintained for the one purpose more than for the other."

Continuing, the Master of the Rolls observed :

"Then Lord Cottenham goes on, in *Sharp* v. *Taylor,* to say : 'Do the authorities negative this view of the case? The difference between enforcing illegal contracts and asserting title to money which has arisen from them is distinctly taken in *Tenant* v. *Elliott* and *Farmer* v. *Russell,*

and recognized and approved by Sir William Grant in *Thomson* v. *Thomson.*' Yes; but not in that way. I have already explained what those cases were. Those were not cases in which one of the two parties to an illegal contract sought to recover from the other a share of the proceeds of the illegal contract. Then he goes on to distinguish *Sharp* v. *Taylor* in a way which probably distinguishes it from cases which would be open to exception on the ground of criminality. Those are all the authorities to which I think it necessary to refer. I think the principle is clear that you cannot directly enforce an illegal contract, and you cannot ask the court to assist you in carrying it out. You cannot enforce it directly; that is, by claiming damages or compensation for the breach of it, or contribution from the persons making the profits realized from it."

*Sharp* v. *Taylor* should not be carried at all beyond the facts of the case as set out in the report.

In *McBlair* v. *Gibbes, supra,* the question was in relation to the validity of an assignment by an assignor of his interest in an illegal contract. The payment of the money arising therefrom had been, subsequently to the assignment, provided for by the party owing it, and the dispute arose between the representatives of the assignor and those of the assignee as to which were entitled to the share originally due to the assignor. It was claimed on the part of the representatives of the assignor that the original contract being illegal, the sale and assignment of an interest therein from him to the assignee was also illegal, and consequently that such interest, equitable or legal, passed to the assignor's executors. Mr. Justice Nelson, however, in delivering the opinion of the court, said:

"But this position is not maintainable. The transaction, out of which the assignment to Oliver arose, was uninfected with any illegality. The consideration paid was not only legal, but meritorious, the relinquishment of a debt due from Goodwin to him. The assignment was subsequent, collateral to, and wholly independent of, the illegal transactions upon which the principal contract was founded. Oliver (the as-

signee) was not a party to these transactions, nor in any way connected with them. It may be admitted that even a subsequent collateral contract, if made in aid and in furtherance of the execution of one infected with illegality, partakes of its nature, and is equally in violation of law; but that is not this case. Oliver, by the assignment, became simply owner in the place of Goodwin, and as to any public policy or concern supposed to be involved in the making, or in the fulfilment of such contracts, it was a matter of entire indifference to which it belonged. The assignee took it, liable to any defence, legal or equitable, to which it was subject in the hands of Goodwin. In consequence of the illegality the contract was invalid, and incapable of being enforced in a court of justice. The fulfilment depended altogether upon the voluntary act of Mina, or of those representing him. No obligation existed, except what arose from a sense of honor on the part of those deriving a benefit from the transaction out of which it arose. Its value rested upon this ground, and this alone. The demand was simply a debt of honor. But if the party who might set up the illegality chooses to waive it, and pay the money, he cannot afterwards reclaim it. And, if even the money be paid to a third person for the other party, such third person cannot set up the illegality of the contract on which the payment has been made, and withhold it for himself."

What is meant by a collateral contract or a cause of action arising therefrom, which does not require reference to the principal illegal contract or transaction, is still further illustrated in *Armstrong* v. *Toler*, 11 Wheat. 258. In the course of his opinion Mr. Chief Justice Marshall assumed the facts to be that the plaintiff, during a war between this country and Great Britain, contrived a plan for importing goods on his own account from the country of the enemy, and goods were also sent to B by the same vessel. The plaintiff, at the request of B, became surety for the payment of the duties which accrued on the goods of B and was compelled to pay them, and the question was whether he could maintain an action on the promise of B to return this money, and the

court held that such an action could be sustained. The court said:

"The case does not suppose A to be concerned, or in any manner instrumental in promoting the illegal importation of B, but to have been merely engaged himself in a similar illegal transaction, and to have devised the plan for himself, which B afterwards adopted."

And again: "The questions whether the plaintiff had any interest in the goods of the defendant, or was the contriver of, or concerned in, a scheme to introduce them, or consented to become the consignee of the defendant's goods, with a view to their introduction, were left to the jury. The point of law decided is, that a subsequent independent contract, founded on a new consideration, is not contaminated by the illegal importation, although such illegal importation was known to Toler, when the contract was made, provided he was not interested in the goods, and had no previous concern in their importation."

And at page 274: "In most of the cases cited by the counsel for the plaintiff in error, the suit has been brought by a party to the original transaction, or on a contract so connected with it as to be inseparable from it. As, where a vendor in a foreign country packs up goods for the purpose of enabling the vendee to smuggle them; or where a suit is brought on a policy of insurance on an illegal voyage ; or on a contract which amounts to maintenance; or on one for the sale of a lottery ticket, where such sale is prohibited ; or on a bill which is payable in notes issued contrary to law. In these, and in all similar cases, the consideration of the very contract on which the suit is brought is vicious, and the plaintiff has contributed to the illegal transaction."

The case of *Armstrong* v. *American Exchange Bank, supra,* is similar to the cases of *Tenant* v. *Elliott* and *Farmer* v. *Russell,* and was decided upon the same principle.

Counsel for the complainant also refer to a case where a plaintiff had let his horse to the defendant on Sunday, and the defendant had injured the horse by his recklessness and negligence, and a recovery against him was had for the damages

occasioned by such negligence, notwithstanding the illegality of the contract of hiring, because in violation of the law relating to the Sabbath day. *Hall* v. *Corcoran*, 107 Mass, 251.

In that case the court held the cause of action was not founded upon the contract, but the defendant was held liable by reason of his improper and neglectful conduct in regard to the horse in his possession, and which conduct was a violation of the legal duty he owed to the owner of such horse, irrespective of contract. The case was a clear instance of a proper recovery based upon collateral facts, and not founded upon any original illegal contract.

The same principle was held in *Welch* v. *Wesson*, 6 Gray, 505, as the damage done plaintiff by the wilful act of defendant in running into him with his sleigh had nothing to do with the race they were engaged in.

To the same effect is *Woodman* v. *Hubbard*, 5 Foster, [N. H.] 67. The act of damage to the horse upon which the liability rested was not connected with or part of the illegal Sunday hiring.

We think it clear that these cases cited as authority for a recovery in this case upon the ground of completion of the illegal contract or of a new contract upon a good consideration, do not touch the case before us, with the possible exception of *Sharp* v. *Taylor*, *supra*, and that case ought not to be extended.

In the case at bar, the action depends upon the entire contract between the parties, part of which we hold was illegal. The partnership part of the agreement cannot be separated from the rest. The complainant's claim to profits rests upon the entire contract; his right is based upon that which is illegal and utterly void, and he cannot separate his cause of action from the illegal part, and claim a recovery upon the written portion providing for and evidencing the partnership.

We come now to a consideration of the two cases upon which the counsel for the complainant specially rely for the maintenance of this action. They are *Brooks* v. *Martin*, 2 Wall. 70, and *Planters' Bank* v. *Union Bank*, 16 Wall. 483. Of the

two cases, *Brooks* v. *Martin* is the more like this one, although the cases are by no means precisely similar. The partnership in that case was stated by the court, in its opinion, to have been really engaged, probably with the full knowledge of all its members, in dealing in soldiers' claims long before any scrip or land warrants were issued by the Government and contrary to the ninth section of the act of February 11, 1847, providing for the granting of land warrants to be issued to the soldiers.

The main object of the ninth section of the act was, as the court stated, to protect the soldiers against improper contracts of the precise character of those shown in the record. It was further said that the traffic for which this partnership was formed was illegal, and that if a soldier who had sold his claim to these partners had refused to perform his contract or to do any act which was necessary to give them the full benefit of their purchase, no court would have compelled him to do it or give them any relief against it; or if one of the partners, after the signing of the articles, had said to the other, "I refuse to proceed with this partnership because the purposes of it are illegal," the other partner would have been entirely without remedy. And if, on the other hand, one of the partners had said, "I have bought one hundred soldiers' claims, for which I have agreed to pay a certain sum which I require you to advance, according to your contract," the other partner might have refused to comply with such demand, and no court would have given either of the partners any remedy for such refusal.

The court further stated that upon the facts existing, all the claims purchased by the partner having been turned into land warrants and the warrants having been sold or located, and where the purchase of the claim had been made prior to the date of the warrant, assignments having been subsequently made by the soldiers, and the portion of the lands located having been sold partly for cash and partly on mortgage, and the assets of the partnership consisting then almost wholly of cash securities or of lands; — all these facts appearing, the partner in whose possession the profits of the partnership

were could be compelled to account by the other partner, and that the fact that such partner had given a release procured from him by fraud was no bar to his action for such an accounting.

The action was sustained upon the theory that the purpose of the partnership agreement had been fully closed and completed; that substantially all the profits arising therefrom had been invested in other securities or in lands; and that therefore it did not lie in the mouth of the partner who had by fraudulent means obtained possession and control of these funds to say to the other that the original contract was illegal. The wrong originally done or intended to the soldier had been wiped out by the acts of the soldier and his waiver of any claim by reason of the illegal contract. The transactions which were illegal, the court said, had become accomplished facts, and could not be affected by any action which the court might take. The cases of *Sharp* v. *Taylor*, *Tenant* v. *Elliott*, *Farmer* v. *Russell*, *Thomson* v. *Thomson* and *McBlair* v. *Gibbes* were cited as authority for the proposition.

We have already adverted to each of them, and we admit it is quite difficult to see how, with the exception of *Sharp* v. *Taylor*, the principle upon which they were decided could be applied to the case then before the court.

There is a difference between the case before us and that of *Brooks* v. *Martin*, because in the latter case the fact existed that the transactions, in regard to which the cause of action was based, were not fraudulent, and they related in some sense to private matters, while in the case before the court the entire contract was a fraud and was illegal, and related to a public letting by a municipal corporation for work involving a large amount of money, and in which the whole municipality was vitally interested. It may be difficult to base a distinction of principle upon these differences. We do not now decide whether they exist or not. We simply say that taking that case into due and fair consideration, we will not extend its authority at all beyond the facts therein stated. We think it should not control the decision of the case now before us.

In *Planters' Bank* v. *Union Bank, supra,* Confederate bonds had been sent by one party to the other for sale, and the bonds had been sold by such party as agent of the plaintiff and their price paid to such agent of the party selling, and the court held that an action would lie to recover the proceeds of that sale thus paid to the plaintiff's agent, although no suit could have been maintained by plaintiff against the purchaser for the purchase price of the bonds, because their sale was an illegal transaction. But when the purchase price of the bonds was paid, it certainly did not rest with the person who received the money upon an express or implied promise to pay it over to set up the illegality of the original transaction. When the bank received the funds, there was raised an implied promise to pay them to their owner, and a recovery could be sustained upon the same ground taken in *Tenant* v. *Elliott* and the other cases above mentioned.

It is impossible to refer to all the cases cited from the various state courts regarding this question. Some of them we should hesitate to follow. The cases we have commented upon we think give no support for the claim that the case now before us forms any exception to the rule which, as we believe, clearly embraces it. We must take the whole agreement, and remember that the action is between the original parties to it; that there is no collateral contract and no new consideration and no liability of a third party. The partnership is but a portion of the whole agreement.

We must, therefore, come back to the proposition that to permit a recovery in this case is in substance to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand. The court refuses to enforce such a contract and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has been often stated in similar cases that the defence is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations and in order the better to secure the public against dishonest transactions. To refuse to grant either party to an illegal

contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum. The more plainly parties understand that when they enter into contracts of this nature they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law.

Being of the opinion that the contract proved in this case was illegal in the sense that it was fraudulent, and entered into for improper purposes, the law will leave the parties as it finds them.

The judgment of the Circuit Court of Appeals was right, and must be

*Affirmed.*