## FIRST NAT. BANK OF MAUD v. McKOWN et ux.

No. 8198—Opinion Filed Nov. 19, 1918.

(176 Pac. 245.)

**1. Banks and Banking—National Bank— Ultra Vires—Buying and Selling Cotton.**

A national bank cannot lawfully engage in the business of buying and selling cotton; such business being beyond the scope of the bank's powers as authorized by law.

**2. Bills and Notes—Mortgages — Illegal Transaction—Enforcement.**

The courts will not enforce a written

note and mortgage given by one of the parties to an unlawful transaction, to cover damages resulting to the other party from such unlawful transaction.

### 3. Banks and Banking—Suit on Note and Mortgage—Ultra Vires.

If a loss accrues to a bank because of ultra vires transactions, acquiesced in by the directors of the bank, and to which the president and cashier of the bank were parties, and such president induces the cashier and his wife to make notes and mortgages covering such loss, which notes and mortgages are afterwards assigned to the bank, such instruments are tainted with the wrong, and cannot be enforced in a suit in the name of the bank instigated by such president.

### 4. Same.

If a national bank engaged with its cashier to buy and sell cotton on the market for the purpose of increasing the deposits of the bank, or knowingly permits the same to be done through a period of years, receiving the benefits and profits of such transactions and makes no objections thereto until a loss of $3,000 accrues and the loss is discovered by a bank examiner, whereupon the president of the bank, who was a party to the cotton transactions, persuades such cashier and his wife to execute notes and mortgages, with the agreement that said mortgages shall not be recorded, and that the bank will not require the notes to be paid, and with the understanding that such notes and mortgages are made for the purpose of deceiving the bank examiner, the notes and mortgages being made to a clerk of the president of the bank, and by such clerk transferred to the bank, such notes and mortgages cannot be enforced by the bank against the makers thereof. on a theory, urged by the bank, that the loss occurred because of ultra vires acts, and that the consequent liability of the directors in damages to any one injured by their unlawful acts was a sufficient consideration for the cashier, who was also a director, to make and execute the notes and mortgages, such notes and mortgages are without lawful consideration, and the bank, being a party to the unlawful transactions by which the loss was incurred, cannot enforce the notes and mortgages based thereon against its joint tort-feasor in said transactions.

(Syllabus by Stewart, C.)

Error from Superior Court, Pottawatomie County; Leander G. Pitman, Judge.

Action by the First National Bank of Maud, Okla., against Omer McKown and Cora E. McKown. From a judgment for defendants, plaintiff brings error. Affirmed.

F. H. Reily, for plaintiff in error.

Mark Goode, for defendants in error.

Opinion by STEWART, C. The plaintiff filed petition against the defendants, setting up two causes of action on promissory notes made by defendants and secured by mortgages on real estate belonging to the defendants. The answer of defendants admits the execution of the notes and mortgages, sets up failure of consideration, and alleges that said notes and mortgages were made to Minnie H. Davis, a clerk of R. J. Edwards, president of the plaintiff bank, without consideration, and by the said Minnie H. Davis assigned to the bank without consideration; that the notes and mortgages were made in pursuance of an agreement between the defendants and the plaintiff to deceive a bank examiner, who had examined the bank and discovered a cotton overdraft in the sum of $3,000; that the defendant Omer McKown was cashier of said bank, and for a number of years had been buying cotton for the bank, being duly authorized so to do; that, while the account was carried on the books in his name, the cotton transactions had been wholly for the benefit of the bank, and with the knowledge and consent of the directors of such bank; that all profits derived from the purchase of cotton inured to the benefit of the bank, and not to the defendant Omer McKown, and that for the years 1913 and 1914 there was a loss on the cotton transactions, which appeared in the form of the overdraft named; that at the suggestion of R. J. Edwards, president of the bank, the defendants, husband and wife, made and executed the notes and mortgages in question, with the understanding that they were to be assigned to the bank; that it was agreed that said mortgages should not be placed of record, and the same were not placed of record for more than seven months, and that the defendant would not be required to pay said notes, but that the overdraft would eventually be taken up out of profits of the bank; that at the instance of the president of the bank, and with the consent of the directors, it was agreed that, in order to increase the deposits of the bank, cotton should be bought by defendant Omer McKown, the bank to receive the profits and bear the losses.

There is evidence in the record tending to prove the allegations contained in the answer, and to show that from the year 1909 to the year 1914, inclusive, the bank, through the agency of the defendant Omer McKown, had engaged in the handling of cotton as alleged, the profits therefor being credited on the books to the bank. and that in the years 1913 and 1914 the loss of $3000 accrued. There is evidence that the

profits from the cotton transactions were credited to the bank, and that the bank, through its officers, had knowledge thereof and ratified the same; that, when the shortage in the cotton account was discovered by the bank examiner, at the request of the president of the bank, the notes and mortgages were executed by the defendants under the circumstances mentioned in the defendants' answer, and for the purpose of deceiving the bank examiner, so that the bank would pass inspection. All of the other material allegations in the answer were sustained by the evidence. While the plaintiff claims that Mr. McKown had been buying cotton on his own account and without authority from the bank, the testimony being conflicting, we are bound by the jury's finding as to the facts. Such finding was against the contention of the plaintiff.

The plaintiff makes several assignments of error, but the vital question, and the only one necessary to be determined, is whether or not, under the facts in evidence, as a matter of law, the defendants are under any legal obligation to the bank because of the making of the notes and mortgages in question. Assuming, as we must, on account of the jury's verdict, that they were executed in pursuance of an agreement to deceive the bank examiner, and not for the purpose of paying an indebtedness owing to the bank by the defendant Omer McKown, it must follow that there was no sufficient lawful consideration to support their execution. But the plaintiff urges that the bank was without authority to engage in the cotton business, and that, if Mr. McKown, as cashier and director, together with the other directors, permitted such to be done, each of the directors, including Mr. McKown, would be individually liable for any damage to the bank resulting therefrom, and that such liability on the part of Mr. McKown would constitute a valid consideration of the notes and mortgage sued upon. It is urged with equal vehemence by the defendants that the bank, being a party to such authorized and unlawful transaction, could not recover. The bank, having urged the reasons named in support of a consideration for the notes and mortgages, must accept the legal consequences of such a position.

Plaintiff calls attention to City National Bank of Mangum v. Crow et al., 27 Okla. 107, 111 Pac. 210, Ann, Cas. 1912B, 647, wherein this court quotes with approval from Stephens v. Overstolz (C. C.) 43 Fed. 465, in which quotation we find the following:

"The officers of a bank are forbidden to do a certain thing because it may tend to the ruin of the bank. The statute says you shall not do that, and, if you do it, you shall be liable to all persons injured by your wrongful act. You shall be liable to the bank, you shall be liable to the stockholders, and you may be liable to the general creditors of the bank, or the depositors of the bank. The extent of that liability is not affected by the circumstances which misled you, or by your criminal intention, but depends on the fact that the act was done knowingly, and was in violation of the law. The extent of the liability incurred is the amount of damages you have inflicted upon others."

The quotation is no doubt a correct statement of the law. Under proper circumstances, an action can be maintained by any one injured—stockholders, creditors, depositors, and by the bank itself. It could hardly be said, however, that a joint tort-feasor, one who had participated in the wrongdoing, could maintain an action. In the City National Bank Case, it appears that the action was instituted by new officers of the bank against the former officers; a reorganization as to officers having taken place. In the instant case, the evidence shows that the action was brought at the instance of the president of the bank, who was a party to the unlawful transactions, and not brought on the part of any interested party, free from participation in the wrongdoing. The effect of enforcing the notes and mortgages would be to make a scapegoat out of one party to the wrong, and to permit another, under whose advice and direction the wrong was done, to reap an unconscionable advantage. While the courts will leave the parties to any unlawful transaction, whether willfully done or not, where they place themselves, yet the processes of the courts will not be lent to enforce any contract, though nominally not flowing to the wrongdoer, which the evidence shows will in fact redound to the benefit of the primarily guilty party, and to the utter ruin of one shown by the evidence to be less guilty not so much out of commiseration for the lesser offender, as because of the wholesome policy of the law, which requires litigants to come into court with clean hands. When, because of the cloak of corporate existence, the guilty are permitted by solemn judicial determination to profit by their wickedness, thus accomplishing by indirection what cannot be done directly, then we may know that the courts have become powerless to preserve their processes from pollution and the time-honored temples of the law must crumble.

We, of course, are neither passing upon the facts nor upon the credibility of the persons involved. Our observations are in response to the argument of counsel, and are made on the assumption of the correctness of the finding of facts necessarily in contemplation of counsel, according to such argument, as having been reached by the jury. If the verdict of the jury must be accepted as a finding of such facts, the transactions upon which the execution of the notes and mortgages is based were unlawful, and the execution and taking of the same became tainted with the wrong. Any suit fathered by the prime actor in such unlawful transactions, although in the name of the bank, would partake of the same nature.

In Citizens' National Bank of Chickasha v. Mitchell et al., 24 Okla. 488, 103 Pac. 720, 20 Ann. Cas. 371, the court says in the syllabus:

"In an action brought in which it is necessary to prove an illegal contract in order to maintain an action, courts will not enforce it, nor will they enforce alleged rights directly springing from such contract."

The reason for this rule is well stated by the Supreme Court of the United States in McMullen v. Hoffman, 174 U. S. 669, 19 Sup. Ct. 851, 43 L. Ed. 1117, being found in the body of the opinion as follows:

"We must therefore come back to the proposition that to permit a recovery in this case is in substance to enforce an illegal contract, and one which is illegal because it is against public policy to permit it to stand. The court refuses to enforce such a contract, and it permits defendant to set up its illegality, not out of any regard for the defendant, who sets it up, but only on account of the public interest. It has often been stated in similar cases that the defense is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public consideration, and in order the better to secure the public against dishonest transactions. To refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly toward reducing the number of such transactions to a minimum. The more plainly parties understand that, when they enter into contracts of this nature, they place themselves outside the protection of the law, so far as that protection consists in aiding them to enforce such contracts, the less inclined will they be to enter into them. In that way the public secures the benefit of a rigid adherence to the law."

If it may be argued in this case that ultra vires acts of the officers could not be charged against the bank, it may be answered that the president of the bank, according to the evidence having taken part in the unlawful transactions from their inception, did not have the power, even for the bank, to make an enforceable contract based upon the unlawful transactions to which he was a party, and from the damaging consequences of which he was interested in freeing himself.

Nor must it be forgotten that, under the statutes, the cashier, if an injury was caused, was, like the president and the other directors, liable only for the damages resulting from the entire cotton transactions, and that, so far as the evidence shows, the damages were not ascertained or agreed upon. There was no balancing of profits and losses, and no amount fixed as damages for which to make settlement, if, indeed, such was intended; and, there being testimony to show that the notes and mortgages were without consideration, and not given in settlement of any such damages, the verdict of the jury will be held to include a finding in favor of such testimony.

A careful perusal of the authorities and the argument offered by counsel does not lead us to any other conclusion than shown in the views expressed. We have examined the instructions given and those requested, as well as the evidence, and find that the trial court did not commit prejudicial error. In fact, all of the errors argued by plaintiff may be properly summed up in the propositions we have discussed. The jury returned a verdict for the defendant, which we would not be warranted in disturbing.

The judgment is affirmed.

By the Court: It is so ordered.