## CLOSING A PLANT TO REMOVE COMPETITION.

[Circuit Court of Crawford County.]

CARL D. FISHER ET AL v. THE FLICKINGER WHEEL CO. ET AL
AND CARL D. FISHER ET AL v. ADAM SEMONES ET AL.

Decided, March, 1906.

*Monopolies—Valentine Anti-trust Law—Sale of Plant to Combination—Constructive Possession—Purpose in View—Consideration—Title—Executed Agreements—Limiting Production—Fixing Prices—Allotments of Business—"Leasing Down" Factories—Vehicle Wheel Club an Illegal Combination.*

1. An organization of manufacturers of a certain commodity which, by assessment of its members, raises a fund with which it "leases down" certain rival factories; and which allots the trade of such factories among its own members, controls the output of its members' factories, and the prices they may charge for the goods they manufacture, binding them not to sell to specified customers except by consent of its officers, is a combination in restraint of trade, and is illegal.

2. A contract whereby such a combination, for a consideration of $66,000, purchases all the machinery of one of its constituent members, a corporation, and stipulates that such corporation shall not compete in business with any of its members, and provides employment for the president of that corporation; it appearing further that such machinery was purchased without any plan for its location and use and has remained unused by the purchaser for eight months after its purchase, is a contract in restriction of trade, and is void.

3. Although the full consideration named in such contract has been paid, the contract does not thereby become an executed contract in the absence of an actual taking possession of such machinery by the purchaser.

4. Under such circumstances a court of equity will not aid the purchaser in obtaining possession as against the receivers of the selling corporation, nor will it aid the purchaser in enforcing the illegal contract as against the proceeds of the sale of the machinery. It will leave the parties where it found them.

HURIN, J.; NORRIS, J., and DONNELLY, J., concur.

The original action out of which both of these proceedings in error grew was brought by Adam Semones to secure an ac-

counting from the Flickinger Wheel Co., defendant; the plaint-iff alleging in his petition that defendant company was insolvent and indebted to creditors in various sums aggregating $200,000, of which more than $69,000 were due plaintiff. He asked an accounting and the appointment of receivers to take charge of defendant's property for the benefit of creditors.

This petition was filed April 15, 1904, and on the same day Edward Flickinger, the president of the company, and Daniel Bachelder were appointed as receivers, and gave bond and qualified. A. M. Snyder was afterwards substituted for Daniel Bachelder as receiver.

These receivers caused the property of defendant company to be appraised and inventoried, and on June 17, 1904, they filed their report of the appraisement.

Afterwards, on June 21st, an intervening petition was by leave of court filed by Carl D. Fisher, Charles Minshall, C. F. Ferguson, O. B. Banister and W. C. Durant, as trustees of a large number of wheel companies named in said intervening petition.

In that petition it is alleged that these trustees were duly appointed by the companies named, about the 17th of August, 1903, for the express purpose of purchasing the personal property therein described and of taking title thereto and holding, controlling and disposing of said title and property for the use and benefit of the companies appointing them, and that they had ever since been acting as such trustees and were the owners of said property and in possession thereof until interferred with by the receivers previously referred to. The property so claimed and described consisted of certain machinery, tools, and appliances located in the buildings previously occupied by defendant, the Flickinger Wheel Co., and formerly used by said company in its business of manufacturing wheels.

Said intervening petition alleges that neither the Flickinger Wheel Co. nor the receivers have any right, title, or interest in said property, but that, notwithstanding these facts, said receivers have wrongfully taken possession of said property and caused the same to be appraised as part of the assets of said

receivership and have ever since wrongfully detained from said trustees the possession thereof and are threatening to and will, unless restrained by the court, cause said property to be sold and the proceeds applied to the payment of the debts of the Flickinger Wheel Co. Wherefore these trustees pray that the receivers may be restrained from proceeding with the sale of said property and ordered to surrender the same to the trustees.

An answer to this intervening petition, filed by the receivers, alleges that the wheel companies named by the intervening petitioners as those for whom they were acting as trustees, had, together with defendant, the Flickinger Wheel Co., entered into an illegal combination and conspiracy and had formed a *trust*, which trust was commonly known as the "Vehicle Wheel Club." That said trust was formed in violation of the act of the General Assembly known as the Valentine Anti-trust Law and was created to carry out a restriction in trade and commerce in all kinds of vehicle wheels, to increase the price of such wheels and to prevent competition in their manufacture and sale.

It is further alleged that the contract of sale referred to in the intervening petition was entered into in order to carry out the purpose of said conspiracy, combination and trust, and especially to remove the Flickinger Wheel Company as a competitor of the organizations composing the Vehicle Wheel Club; that no part of said machinery has ever been delivered to said interveners, or to said trust or to their trustees, but that the same has ever since remained in the possession of the Flickinger Wheel Co. and of its receivers, and the answer avers that the whole of said contract so made is null and void under the provisions of the Valentine Law and is not enforceable in law or equity.

Wherefore, the receivers pray that said contract may be declared by the court to be absolutely null and in violation of said Valentine Law and that said machinery be decreed to be the property of the Flickinger Wheel Co. and ordered sold by the receivers for the benefit of the creditors of said company.

536    CIRCUIT COURT REPORTS—NEW SERIES.

Fisher et al v. Flickinger Wheel Co. et al. [Vol. VII, N. S.

By reply the trustees deny these allegations of fraud and illegality of contract and deny that they have entered into any conspiracy or trust, and allege facts tending to explain and justify the transactions relating to the property here in dispute; and they further allege that sum of $66,000 paid by these defendants for said machinery was all applied upon the indebtedness of said Flickinger Wheel Co. for the benefit of the creditors of said company.

Notwithstanding the filing of the interveners' petition and the subsequent pleadings relating thereto, the common pleas court proceeded to order a sale of the property in question and, over the protest of these interveners, confirmed the sale.

To this action of the court the intervening trustees prosecuted error to this court; but this court, at a former term, postponed a decision of the case as thus presented and, while said action was pending in this court, the case was heard on its merits in the court of common pleas on the issues raised by the interveners' petition and that court on a full hearing, finding against the claims of the interveners, and that the companies represented by them had combined for an illegal purpose in contravention of the anti-trust laws of the state, that said combination was unlawful, and that there was no sale and delivery of the machinery of the Flickinger Wheel Co. to the Vehicle Club, and that the possession thereof had remained in the Flickinger Wheel Co. and its receivers, said interveners again prosecute error to this court, and both bills of exceptions and the proceedings connected therewith are now before us for review and will be considered together.

In their oral argument of this case counsel for the interveners contend—

1st. That, on the evidence presented, the title and possession of the disputed machinery was in the trustees at the time the said suit was brought.

2d. That though that title and possession were disputed, the common pleas court had no right to order a sale of said property until that title and possession were judicially settled.

3d. That to deny them the right to their property and to relegate them to the proceeds of the sale thereof, should the

title of said property be finally determined to be in them, would be a denial of justice.

4th. That there was no illegality about the organization of the so-called Vehicle Wheel Club; that it was not a trust, nor a combination in restraint of trade and hence that its acts and particularly the purchase of the machinery in question were wholly legal and should be upheld.

5th. That, whether such combination and such purchase were in themselves illegal or not, makes no difference in law, for the reason that such purchase is now an *executed agreement;* that at the time of the filing of the petition a full and adequate consideration had actually been paid for said property by its purchasers, the trustees; that they were in actual possession of said property under said purchase and that, therefore, their possession can not now be legally disturbed.

6th. That as there is no claim made that the Flickinger Wheel Co. was insolvent at the time of the purchase of the machinery; as the price paid was fair and adequate; and as no offer is now made to restore the price then paid for that machinery; the defendants ought not to be allowed by a court of equity to hold both the $66,000 paid them and the machinery for which it was paid.

We have read with care the bill of exceptions in this case and from its evidence thus presented we find the following facts relevant to the issues, viz:

That for about two years prior to the month of August, 1903, representatives of certain corporations and firms engaged in the manufacture of wood wheels for vehicles, had been in the habit of meeting together and had organized for "social intercourse," as was claimed, and for the discussion of matters pertaining to the business in which they were all engaged; that their organization was known as the Vehicle Wheel Club and comprised most of the firms or corporations engaged in that line of business, including all in Ohio but two, and a like proportion in Indiana and Michigan, and perhaps other states. That these meetings were held in various cities at stated times, sometimes in Chicago, sometimes in Indianapolis and again at Niagara

538    CIRCUIT COURT REPORTS—NEW SERIES.

Fisher et al v. Flickinger Wheel Co. et al. [Vol. VII, N. S.

Falls, and at Galion, Detroit, Dayton and elsewhere, the meetings being held as often as once a month.

The secretary of the organization testifies that he does not know the objects of the association, that it did not deal in anything nor do any business at all as a club, but that at their meetings they discussed the prices that ought to prevail in their business and endeavored to secure uniformity of prices; that they assessed each member of the club for expenses at rates amounting to ten cents or fifteen cents per set on all wheels manufactured—a sum which we find would amount to many thousands of dollars each year, as in St. Louis alone over 100,000 sets of wheels are sold each year by the members of this club.

It further appears from the evidence that this club exerted its influence toward uniformity of prices and, through its officers, induced a large majority of its members to agree not to increase their plants or to enlarge their facilities and this with the expressed purpose of limiting the production of wheels; that said club was in the habit of allotting to its members the portions of the trade of their districts to which each was supposed to be entitled and did attempt to so allot and divide up the business of the Flickinger Wheel Co. after it agreed to cease doing business; and that in fact the business of all its members were subject to such allottment; that, by agreement, all the members of said club also bound themselves, at least on one occasion, not to deal with a certain corporation engaged in the buggy business nor to execute any orders received from it except under instructions from the president of the Vehicle Wheel Club, Edward F. Flickinger; that the sale of all the product of the several factories of the members of the club, was placed under the control of a committee appointed by the club and that the prices to be secured for such product were to be determined and controlled, not by the individual manufacturer, but by the club and its officers, and that no member could make a contract at less than the association price without first consulting the president and advisory committee.

As shown by the club's minutes, arrangements were likewise made whereby all members agreed that in dealing with

jobbers all members should quote prices from a particular schedule of prices, excepting *that particular member* to whom a particular jobber had been alloted, and he was to quote prices from another schedule; but that this method of doing business was by agreement to be carefully concealed from the trade generally. Arrangements were likewise made for the "leasing down" by the club of certain competing factories and the allotment of their business among the members of the club—.the money needed for the purpose to be raised by an additional assessment of fifteen cents per set of wheels upon all the product of the factories represented in the club.

It further appears from the evidence that about the 17th day of August, 1903, the plant of the Flickinger Wheel Company, including its machinery, tools and appliances, but not including its real estate, were purchased by the Vehicle Wheel Club, and the title so acquired placed in the names and under the control of certain trustees, the interveners in this action; that the price paid was $66,000, which was paid in full by the Vehicle Wheel Club to the Flickinger Wheel Company, which in turn executed and delivered a formal and complete bill of sale of the property; that by the terms of the contract of purchase, said Flickinger Wheel Co. was to be allowed to operate said plant for about 60 days in order to work up the stock on hand, and the machinery, etc., so sold was to be under the control of Edward Flickinger, who was at the time president both of the Flickinger Wheel Co. and of the Vehicle Wheel Club, but that his possession was agreed to be that of the Vehicle Wheel Club, the purchasers; that previous to said purchase the machinery had been duly appraised by the American Appraising Company at $64,000, and that by the terms of the agreement $6,000 of the $66,000 paid was to be applied as rental on the buildings in which the property purchased was to be stored for the period of three years at $2,000 per year.

It further appears from the evidence that none of this property was ever moved away by the purchasers nor any manual possession taken of it by them except that it was inspected and handled by the trustees, and perhaps other members of the

540    CIRCUIT COURT REPORTS—NEW SERIES.

Fisher et al v. Flickinger Wheel Co. et al. [Vol. VII, N. S.

Vehicle Wheel Club, and plans discussed for its final disposition; and that after the appointment of receivers in this case the property was, by the consent of Edward Flickinger, at that time one of the receivers, tagged as the property of the Vehicle Wheel Club or its trustees; but was afterwards by order of court sold by the receivers and the proceeds are now subject to distribution by the court. It appears also that before said Flickinger would permit said property to be tagged, he demanded and received from the trustees a sum of money exceeding $700, which he claimed to be due him personally but for which no demand had ever before been made.

It finally appears by the evidence that under the contract of sale of said plant, the good will of the Flickinger Wheel Co. was included; and that, as a part of the agreement, said company was to retire from business and not engage in the manufacture of wood vehicle wheels for the period of five years at any point west of New York City and east of Denver, Colorado, in competition with the members of the Vehicle Wheel Club.

Under the facts thus found we have no hesitation in finding that the organization known as the Vehicle Wheel Club was an illegal combination or trust.

Section 4427-1 of Revised Statutes, declares that "a trust is a combination of capital, skill or acts, by two or more persons, firms, partnerships, corporations or associations of persons, or of any two or more of them for either, any or all of the following purposes—

1. To create or carry out restrictions in trade or commerce.

2. To limit or reduce the production, or increase, or reduce the price of merchandise or any commodity.

3. To prevent competition in manufacturing, making, transportation, sale, or purchase of merchandise, produce or any commodity.

4. To fix at any standard or figures, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this state.

5. To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they shall bind or have bound themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure or fixed value, or by which they shall agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure or by which they shall in any manner establish or settle the price of any article, commodity or transportation between them or themselves and others, so as to directly or indirectly preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of any such article or commodity or by which they shall agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected. Every such trust as is defined herein is declared to be unlawful, against public policy and void.

The mere reading of this statute in connection with the facts as previously found suffices to establish the illegality of this association known as the Vehicle Wheel Club. Each one of the five clauses of the act is distinctly violated.

Although its innocent secretary does not know to this day what the objects of the club were, beyond mere social intercourse, it must be apparent to every one else that its main object was to control the trade in wheels—to create or carry out restrictions in the trade or commerce in wheels—the thing forbidden by the first clause of this act. Why else was it engaged in "leasing down" rival factories and allotting the business of those factories among its members? Why was it fixing the prices at which its members could sell the product of their own factories? Why did they bind themselves not to sell to particular customers without the consent of their president and advisory committee?

In the same way each separate one of the five clauses of the act will be found to apply to some one or more of the acts or

542 CIRCUIT COURT REPORTS—NEW SERIES.

Fisher et al v. Flickinger Wheel Co. et al. [Vol. VII, N. S.

practices shown by the minutes of this club to have been done with the club's approval.

That the Vehicle Wheel Club as thus organized and conducted was in violation of the statute is clear. But independent of any statute, the illegality of such an organization would be equally evident. It's whole purpose, its every object, was in violation of the common law. An organization of such a nature is illegal, because it is contrary to public policy, a menace to public safety, a constant threat against the rights of independent producers and of the public generally.

If any authority were needed in support of this proposition the case of *United States* v. *Addyston Pipe Co.*, 85 Fed., 271; 46 L. R. A., 122, clearly establishes the illegality of such organization under the common law, whether in violation of statutory law or not.

But whatever may have been the legal status of the Vehicle Wheel Club, the important question in this case is the character of the contract made between the Vehicle Wheel Club and the Flickinger Wheel Co. Was that contract illegal and void? Or is it enforceable?

Section 4427-8, being a part of the same act relating to trusts, provides that "any contract or agreement in violation of the provisions of this act, shall be absolutely void and not enforceable either in law or equity."

Unless this statute can be restricted in its application to the mere agreement to form a trust, which does not seem to us to be its intended limitation, it must be held to apply to contracts made with intent to carry out the illegal purposes defined by the statute.

Was this such a contract? There is no claim of fraud as to the value paid for the property. It is not denied that the full value and perhaps much more than the full value was actually paid in money. Indeed the same property was afterwards sold by the receivers for about one-eighth of the price previously paid by the Vehicle Wheel Club and this, too, at a competitive sale at which about forty bidders were present.

That the purchaser at that sale shortly afterwards sold the same property to a corporation, of which Edward Flickinger

and his son are active members and officers, for about the same consideration, does not help the matter.

We find that a full and fair consideration was paid by the Vehicle Wheel Club for the machinery, etc., in question.

But we are given to understand by the secretary that this was the only property ever actually owned by the club and that after its purchase nothing was done with it, except to discuss plans for dividing it up or moving it to St. Louis, none of which plans were ever definitely acted upon.

This is not the usual course which business men pursue in making so large a purchase. In such cases a definite purpose or intention to use the thing purchased is always present and in view of the record of this club as revealed by its minutes, and especially in view of the express and minute stipulations of the contract of sale, whereby the Flickinger Wheel Co. agrees to remain out of business—as far as concerns the manufacturing of wheels in competition with the members of the Vehicle Club, and in view also of the stipulations of that contract as to the employment of Edward Flickinger by the Vehicle Wheel Club, we are irresistably drawn to the conclusion that the main ob- ject of the purchase was the restriction of competition—the putting of this plant and its president out of business as a competitor of the other plants represented in the club.

Clearly then the contract comes within the inhibition of the statute and, consequently, is illegal and void and not enforce- able (see *Nutter* v. *Aumon*, 145 U. S., 421, and *McMilhen* v. *Hoffman*, 174 U. S., 639. See again *United States* v. *Addyston Pipe & Steel Co.*, 85 Fed., 271).

But it is claimed and ably argued that, inasmuch as this con- tract has been fully executed, its illegality can not be questioned by the receivers in this case; that the receivers stand in the same position exactly as the Flickinger Wheel Co.; that that company has received its pay in full for this plant—perhaps far more than the real value of the plant to-day; that pre- sumably the $66,000 paid has been applied toward the pay- ment of the creditors of the concern and that this being so, the receivers who represent those creditors can not again

**544    CIRCUIT COURT REPORTS—NEW SERIES.**

Fisher et al v. Flickinger Wheel Co. et al. [Vol. VII, N. S.

demand, or be allowed to receive, a second payment for the same property. That Edward Flickinger having, as president of the Flickinger Wheel Co., received $66,000 for its plant, and delivered possession of it to the purchaser, can not now, as receiver for that company, ask, in good faith, this court to require the purchaser to give up its property, without at the same time tendering to it a return of the money so paid. That for this court to lend its authority to such a course would be to support a fraud and encourage flagrant violations of good faith.

There is much to be said in favor of this view. We are not deeply impressed with the righteousness of this transaction in any of its stages or with the virtue displayed by any of the participants in it. Nor is there any lack of authority for the position thus taken. We are cited to the case of *Thomas* v. *Cronise*, 16 O., 54, an early Ohio case where the Supreme Court laid down the rule thus:

"It is a universal principle, both in law and equity, that where an agreement is founded upon a consideration illegal, immoral, or against public policy, a court will leave the parties where it finds them. If executed, the court will not rescind it; if executory, the court will not aid in its execution."

To the same effect are *Hooker* v. *Palos*, 28 O. S., 251; *Kahn* v. *Walton*, 46 O. S., 207; *Emery* v. *The Ohio Candle Co.*, 47 O. S., 320; *Buchannan Bridge Co.* v. *Campbell*, 60 O. S., 406.

The question thus becomes all important whether this contract was an executed or an executory contract.

That the full consideration agreed upon was paid is not denied; that the machinery was formally sold and a bill of sale delivered, are equally true; that the machinery was treated as delivered by the parties to the contract as between themselves is a fact unquestioned.

The Vehicle Wheel Club met at Galion, inspected the machinery, talked of it among themselves as delivered, handled it, discussed its future disposition and finally, but after the receiver had been appointed, tagged it.

For two months it was used by the seller to work up the stock on hand—this by agreement of the parties. For nearly

six months more it apparently was allowed to remain idle and the only watchman is said by the younger Flickinger to have been one employed by his father. There was no attempt made by the purchaser to use it or control it, or dispose of it or remove it. Under the agreement no such attempt was necessary—the purchaser had paid three years' rent in advance for the storage of this machinery in the buildings in which it was located.

Some evidence was offered and we think properly rejected by the court to the effect that this property was advertised for sale by the trustees, and notice sent to Edward Flickinger. But this evidence, even if admitted, would not show actual, open possession. *As between the parties,* and especially if the transaction itself had been a legal one, such constructive possession would unquestionably have been upheld as a delivery. Edward Flickinger in all his intercourse with the trustees treated the property as theirs.

But in this case third parties' interests are involved, creditors have commenced suit and caused receivers to be appointed; possibly some of these creditors gave credit to the Flickinger Wheel Co. on the strength of the apparent ownership of this machinery by the Flickinger Wheel Co. after it was in reality sold; as to this we are not advised. But at any rate, the machinery was allowed to remain in its place, much of it imbedded in concrete, or bolted to the floors, for eight months after its sale, with no apparent change of ownership. so far as third parties could see; part of that time openly used as before, by its former owners, apparently still its owners, and no attempt was made by the purchasers, until after the receivers were appointed, to show to the world their title or possession.

All this, together with the illegal character of the transaction itself, goes far toward overcoming any presumption raised by a constructive taking possession such as is claimed to have occurred, and in our opinion the proofs of possession taken are not sufficient under the circumstances to justify us in holding this to have been an executed contract. Those purchasers were in a position, as far as third parties were concerned, where they could either affirm or deny their ownership, as might seem best

546    CIRCUIT COURT REPORTS—NEW SERIES.

Fisher et al v. Flickinger Wheel Co. et al. [Vol. VII, N. S.

to them; and, having taken that position, a court of equity in view of the illegal character of the transaction will leave them where it finds them.

If we are right in the view we have taken as to the possession of this property not being complete in the intervening trustees, then the authority cited by them, and relied upon, viz., the case of *Kahn, Jr.,* v. *Walton,* 46 O. S., 195, is in reality strongly in favor of the action taken by the common pleas court. Indeed all the cases cited by counsel for the interveners are strongly against them unless we are prepared to concede a full and complete possession by them of the machinery in question and this, too, legally and in good faith. This we can not do.

What constitutes a complete delivery of personal property is not easily determined; no uniform rule can apply to all cases. Much depends on the nature of the property, the usages of the trade in relation thereto, its location, its moveability, whether or not it is attached to realty and, if so, how it is attached. The question as to the good faith of its acquisition often becomes material and, as in the case at bar, the legality of its transfer. A transfer of possession, sufficient as between the parties, is often wholly insufficient as against the claims of third parties. And so the authorities cited by counsel for interveners, while applicable to transfers of personal property of a moveable character transferred in good faith and with sufficient publicity to satisfy the conditions of the cases in which they were questioned, are none. of them satisfactory as authority in view of the conditions prevailing in this case. The rule, for instance, expressed in the case of *Newall* v. *Langdon,* 39 O. S., 87, as applicable to the sale of flour stored in a railroad depot, depended on a usage of the business and can have no applicability to the case at bar.

Much stress is laid by counsel for the interveners upon the fact that, before the receivers took possession of this property, it was tagged by the order of the trustees as their property. It may well be questioned whether such tagging by permission of a receiver after he had assumed the duties of the receivership and apparently without the knowledge of his associate receiver, and especially in view of the relations which had ex-

isted between the receiver who so permitted the tagging and the parties whose interests were to be preserved by the tagging, could add much weight to the claim of possession. Nor does the fact that before he would permit such tagging he demanded and received a personal payment to himself of over $700 for claims which apparently had never before been heard of, add weight to the claim of possession thus acquired.

In the opinion of this court then, the proofs have wholly failed to establish such complete possession of this plant by the trustees as is necessary to support their claim that the contract is an executed contract. All of the rights of the intervening trustees depend upon this claim. To support their alleged right to the property in dispute, they are obliged first to prove a contract of sale—which we have found to be an illegal contract —and secondly, the execution of that contract by a taking of possession, which we have found to have been incomplete and insufficient to pass title as against third parties.

As they themselves admit, it must follow that a court of equity will leave them where it found them. This is the universally accepted rule. Were any authorities needed in addition to the Ohio authorities previously cited in this opinion we need only to refer to the case of *McMullen* v. *Hoffman*, 174 U. S., 639, 654, where it was said by Justice Peckham:

"The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way toward carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract. In cases of this kind the maxim is '*Potior est conditio defendentis.*' "

How then does this rule leave the interveners?

We have found that the contract of purchase of this machinery, on which contract alone they base their claim for it, was an illegal contract. We have found that they were not in actual possession of this machinery at the time the receivers were appointed or at the time when the receivers took possession of it. If they were not in possession of it, the ma-

chinery must be held to have been in the possession of the
Flickinger Wheel Co. In that position the court found the
parties. It must leave them just there. It can not aid them
in securing possession nor in preventing the receivers from ob-
taining possession, nor after the receivers have obtained pos-
session, can it aid them in enforcing their illegal contract as
against the proceeds of the sale of the machinery. Their or-
ganization was illegal; their contract was void; their possession
was never an actual possession.

It follows that in this case at bar they have no standing.
If this apparently works a hardship upon them, it is only the
result of their own violation of the law. If, on the other hand
it is true, as seems possible, that the price paid, ostensibly for
the plant, was in fact paid principally or wholly for the purpose
of removing a competitor in violation of law, they have secured
what they sought to secure.

If the view we have thus taken is correct, it follows that the
court of common pleas did not err in ordering the receivers
to appraise and sell this property, or in confirming that sale,
nor did it err in finding that said Vehicle Wheel Co. was an
illegal combination, and that the terms of the contract of sale
of said machinery, etc., are in restraint of trade and in direct
contravention of the anti-trust statutes of the state of Ohio,
and, as such, are against public policy and void and can not
be enforced.

Finding no other error, the judgment of the court of common
pleas will be affirmed with costs. Judgment against the inter-
veners for costs, execution awarded and cause remanded for
execution.

