### WESTWOOD v. COLE et al.

(Supreme Court, Special Term, Chautauqua County. January, 1910.)

1. EQUITY (§ 65*)—MAXIMS—CLEAN HANDS.
   He who comes into equity must come with clean hands, and he may not found his claim for relief solely on a beneficial provision contained in a contract, where he has repudiated the conditions and covenants entered into by him and which form the consideration for the agreement of the adverse party.
   [Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 185–187; Dec. Dig. § 65.*]

2. PARTNERSHIP (§ 273*)—REPUDIATION OF FIRM AGREEMENT.
   A repudiation by a partner of his own obligations may be considered as a repudiation of the partnership.
   [Ed. Note.—For other cases, see Partnership, Cent. Dig. § 620; Dec. Dig. § 273.*]

3. PARTNERSHIP (§ 298*)—RIGHT TO ACCOUNTING.
   Where a partner lies by and by his conduct intimates to the copartners that he has abandoned his share, the copartners may do with it

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

what they please, and the partner is estopped from subsequently complaining.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 681; Dec. Dig. § 298.*]

**4. PARTNERSHIP (§ 306*)—RIGHT TO PROFITS.**

Plaintiff and defendants formed a partnership to put up a congressional seed distribution provided they were awarded the bid therefor, and they agreed to supply the necessary capital and share in the profits and losses in a specified proportion. The firm was awarded the contract, and a bond was executed to secure performance. Plaintiff failed to make his contribution to the firm, though often requested, and though given opportunity so to do. Defendants subsequently supplied the necessary funds to perform the contract and performed the contract in the firm name after they had failed to secure a new contract from the government in their name. The contract with the government was not assignable. Plaintiff was not financially responsible and could not procure a surety to secure performance of the contract. *Held* that, as plaintiff could not complain because he was excluded from the firm business, he was not entitled to share in the profits after the completion of the contract by defendants.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 709; Dec. Dig. § 306.*]

**5. PARTNERSHIP (§ 21*)—EXISTENCE OF RELATION—EXECUTORY AGREEMENT.**

A memorandum executed by plaintiff and defendants, which recited that they had entered into a partnership to put up a congressional seed distribution, provided they were awarded the bid, and which provided that they should supply the necessary capital and share in the profits and losses in specified proportions, etc., did not evidence a partnership, but an agreement to enter into one provided the parties were awarded the bid, and when the contract with the government was executed the firm came into existence, and it then became the duty of the parties to supply their proportion of the capital, and the promises of the parties to supply the capital were mutual and concurrent, and a contribution to capital was a condition to the right to claim profits.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 6; Dec. Dig. § 21.*]

**6. PARTNERSHIP (§ 102*)—REMEDY OF PARTNER EXPELLED.**

A partner expelled from the firm may sue to establish the firm and for an accounting after the expulsion, or he may sue at law for damages on account of the expulsion and recover prospective profits.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 156; Dec. Dig. § 102.*]

**7. CONTRACTS (§ 278*)—RIGHT TO ENFORCE—PERFORMANCE OF CONDITIONS.**

The rule at law that neither party to a contract may enforce it against the other without performance or willingness and readiness to perform on his part prevails in equity.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1207; Dec. Dig. § 278.*]

**8. PARTNERSHIP (§ 259½*)—WRONGFUL TERMINATION—EFFECT.**

A partner may not of his own motion treat the firm as ended and take to himself all the benefits of the joint labors and property of the partners, or exempt himself from responsibility to account to the excluded partner.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. § 600; Dec. Dig. § 259½.*]

Action by Herman J. Westwood against Elton A. Cole and another. Findings for defendants.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Herman J. Westwood, for plaintiff.
Stearns & Thrasher, for defendant Cole.
Arthur C. Wade and George E. Towne, for defendant Crissey.

MARCUS, J.   This action is brought to compel an accounting of profits earned in a joint adventure, and the material facts are these:

On the 10th day of April, 1907, the parties signed this memorandum of agreement:

"This memorandum made April 10, 1907, is to witness that the undersigned have this day entered into a partnership to put up the 1907–1908 congressional seed distribution contract, if they are awarded the bid; they are to supply the necessary capital and share in the net profits and to contribute if any losses ·in the following proportions among themselves, viz.: Cole 45%, Westwood 45%, Crissey 10%. The firm name to be Cole & Westwood; details of getting of the contract and of the work under contract to be as talked and arranged mutually hereafter.          E. A. Cole.
"H. J. Westwood.
"H. J. Crissey."

In pursuance of this agreement the copartnership firm made a proposal to the Agricultural Department of the United States to enter into a contract for seed distribution, which proposal was accompanied by a check for $1,000 as a guaranty that the parties would enter into the contract in case it was awarded to them and furnish a bond as security for its performance.   The said $1,000 was contributed by the parties as follows:   The plaintiff, $450;  the defendant Cole, $450;  the defendant Crissey, $100.   The plaintiff's contribution was raised by means of a promissory note indorsed by Crissey, and it was agreed that when the check was returned each should withdraw the amount of his contribution; and this was afterwards done.   The proposal having been accepted, the parties, on the 1st day of May, 1907, entered into a contract with the government accordingly, and at the same time they executed a bond with sureties.   Crissey delivered to the sureties certain collateral security to protect them from loss.   On the 12th day of June this bond was surrendered and canceled and a new bond was executed, in the penalty of $10,000, with the American Fidelity Company as surety.   The defendants were financially responsible and able to pay to the amount of the penalty of the bond; but it appears the plaintiff was not able to pay, out of his own means, the sum required of him for the purpose of launching the partnership.   Early in the month of June, the partnership had incurred obligations in the amount of about $15,-000, in the purchase of necessary machinery, bags, and packets.   On the 14th day of June, Cole paid into the partnership the sum of $1,-350, and Crissey $300, being each one's share of $3,000, which sum the immediate and pressing necessities of the partnership required to be paid in.   On that day the defendants served upon plaintiff a notice to the following effect:   That in case he failed to pay his contribution to the said sum of $3,000 by June 18th, they (the defendants) would consider the partnership dissolved and would take steps to acquire capital necessary for the performance of the government contract from other sources, and would proceed in the performance of said contract without reference to plaintiff or to any interest he should claim there-

under, and should refuse thereafter to pay him any portion of any profits that might accrue. In reply the plaintiff, on the 18th of June, informed defendants that he had made arrangements for the payment of his share of the capital, but which, however, would not be available for a few days. "You may rest assured that I will be able to and will supply my proportionate share of the capital as it is needed."

The plaintiff having failed to make any payment, though often requested, the defendants, on the 13th of July, drew out the money which they had theretofore contributed, as aforesaid, and at the same time each deposited to the credit of the firm the sum of $500. Subsequently the plaintiff was requested to pay his contribution and promised to do so, but did not. On the 19th of September, the plaintiff was served with another notice of exactly the same purport as the former one, in which he was informed that $2,000 additional must be paid in at once and that he must pay in his share "on or before June 18, 1907." This notice referred to the former one. The plaintiff having failed to pay anything, although verbally requested, the defendants, on the 15th of October, served him with another notice of the very same character, in which they informed him that $4,000 additional must be paid in at once, and that he must pay in his proportionate share. This notice referred to the former notices on the same subject. On the 29th of October, the plaintiff replied by letter, in which he stated that he had been expecting to have money to pay into the partnership treasury, but had unfortunately been disappointed, and it would be several days before he could contribute, and expressed his intention to bear his proportionate share of the capital. "Your letter dated September 19th I did not answer because it hardly required one. You demanded payment by me of a proportionate share of $2,000.00 on or before June 18, 1907, and the letter was dated September 19, 1907. I have been unable to comprehend the meaning of the letter." This, to say the least, shows very peculiar conduct on the part of one copartner towards another; and yet one can hardly help but wonder at such a manifestation of disingenuousness. Obviously, no relation of landlord and tenant existed between the parties, though plaintiff was notified to quit or pay up; and therefore the same strictness as to notices is not demanded or required. And it seems that the plaintiff overlooked the statement in the letter of September 19th that the money "must be paid in at once," etc.

The defendants continued to carry the account of the firm in the name of "Cole & Westwood" up to September, at which time they changed it to "Cole & Crissey." In the fall of 1907, after the plaintiff had failed to fulfill his obligations as a copartner, the defendants requested the Government Department to change the contract so as to allow them to perform it in their own name, but their request was denied. They, accordingly, went on and performed the contract as before and completed the same in the spring of 1908, and in order to do so they were obliged to expend a large amount of money. Since the notice of October 15th, the plaintiff was never recognized as a member of the firm; he did nothing and contributed nothing.

The evidence shows that the defendants had no design and made no

endeavor to get plaintiff out of the partnership, with a view to appropriate the business to themselves and thus to continue it and profit by their own wrong. On the contrary, it appears that they used all reasonable effort to induce plaintiff to remain in the firm and contribute his share of the capital by making frequent demands upon him, both verbally and by letter.

The conclusion to be drawn appears an inevitable one, to wit: That the plaintiff is not entitled, in law or in equity, to any share of the profits earned by means of the capital employed and the exertions made by the defendants, in order to fulfill and complete their own, and the plaintiff's, contract with the government.

The plaintiff bases his right to recover in a court of equity upon the ground that the copartnership relation continued until its objects and purposes were fully accomplished, notwithstanding his utter failure to fulfill his obligation to contribute his proportion of the capital required to launch the partnership and its business and to carry it on to a successful conclusion. He maintains, with great earnestness and some plausibility, that notwithstanding the repeated warnings from defendants to pay up his share of capital, he is nevertheless entitled to a share of the profits produced by the capital invested by the defendants, although he had not contributed a dollar. If plaintiff may assert an equity founded upon the breach of his own obligation, surely the defendants should be permitted to set up a countervailing equity arising from full performance on their part. A party applying to the court for equitable relief must take care and observe the sacred maxims so conspicuously displayed upon the walls of the Temple of Justice, viz.:

"He who seeks equity must do equity."
"He who comes into equity must come with clean hands."

He shall not be permitted to found his claim for relief solely upon a beneficial provision contained in a contract, when he has repudiated the conditions and covenants entered into by him, and which formed the consideration for the defendants' agreement. In other words, it is hardly equitable that plaintiff should be permitted to repudiate his obligation to contribute to the capital of the firm, and at the same time to claim a share of the profits earned by his copartners. It is said, and justly so, that a deliberate and serious breach of the partnership contract may be considered equivalent to a repudiation of it altogether. "He who acts so as to treat the articles as a nullity as it regards his own obligations cannot complain if they are so treated for all purposes." Wilson v. Johnstone, L. R. 16 Eq., 606.

A repudiation by a partner of his own obligations may be considered as a repudiation of the partnership. Denver v. Roane, 99 U. S. 361, 25 L. Ed. 476, quoting the above.

Apparently, it seems, the plaintiff was lying by to wait and see whether the business turned out sufficiently profitable to make it worth while to assert his claim to be a partner, and when the time is come when it is worth while to assert his title then he brings his action. To allow the plaintiff to lie by, in a case of this nature, to watch the course of results, if it should be to his advantage to do so, and to abandon it on a continuance of misfortune and loss, which as a partner he must have

shared, would be at variance with the plainest principles of justice. There can be no doubt that, if the government contract had turned out to be a losing venture instead of a profitable one, the plaintiff would never have asserted any claim to be a partner; but, on the contrary, he would have protested that the defendants had expressly rescinded the contract between them and that he had acquiesced in such rescission. Now, if a party lies by, and by his conduct intimates to the other partners in the concern that he has abandoned his share, they should then be permitted to do with it as they please; if his conduct amounts to a representation of that sort, he should be held estopped by it, and be precluded afterwards from complaining. It would seem that the plaintiff was attempting to play fast and loose; to refuse to pay his share, and then to claim the profits, if successful. He preferred to claim his share of the venture if it should be successful and leave the defendants to bear the loss if any there should be.

Plaintiff argues that because the defendants supplied the necessary capital, upon his default in making his contributions, and proceeded to perform the requirements of the government contract, he is entitled to share in the profits, upon the theory that he had an interest in said contract, and his copartners earned the profits by the use of his "property." But the parties were placed in such a position by reason of plaintiff's prior inducements and subsequent conduct that they found themselves in jeopardy: They must either go on or stop, and thus subject themselves to liability to pay damages. They chose the former alternative—they took hold of that horn of the dilemma. The plaintiff, however, did all that he could, or rather failed to do all that he should, to render himself liable in damages to the government or the surety company. The consequence was that the defendants were under compulsion to supply in some way "the necessary capital" in order to save themselves and the plaintiff from loss, and to prevent the plaintiff from accomplishing his deliberate purpose of self-destruction, financially speaking. A kind and beneficial act done, irrespective of the motive in the doing of it, should not entitle the beneficiary to a reward on account of it having been done, nor should the benefactor be mulcted in damages by reason of the thing.

The government contract was not a contribution made by plaintiff to the partnership, nor is he entitled to any credit, in a legal view, because of the circumstance that he originated the idea of bidding for the contract and to make a profit out of it. He went to Washington to see about it and was put to trouble and inconvenience and incurred expenses, and he went also to New York in relation to the matter. So did Cole. But the contract was not awarded to plaintiff individually, but to the firm; and then it became necessary to execute a bond as security for its performance. Crissey procured the sureties and delivered to them collateral security to protect them from loss, which bond was afterwards canceled and the bond of the surety company substituted therefor. Plaintiff was not financially responsible and could not, it seems, have procured a surety. Even after the execution of the contract and bond, the contract was of no value without sufficient capital to carry it out to completion. The contract was nonassignable, by vir-

tue of the statute, and was subject to annulment by the government in case of assignment, and so it is provided in the contract. Hobbs v. McLean, 177 U. S. 567, 6 Sup. Ct. 870, 29 L. Ed. 940; Mosier v. Kurchoff, 51 Misc. Rep. 435, 101 N. Y. Supp. 643.

Nor could the government consent to an assignment without discharging the surety. And even though the parties formed a partnership in præsenti on the 10th of April, it was not to be, and could not be, launched until they paid in their respective contributions. Defendants launched the partnership with their own funds, without any aid or assistance from the plaintiff in so far as capital is concerned, and subsequently contributed all the required capital and earned all the profits. But the memorandum signed by the parties did not of itself constitute a partnership, but rather an agreement to enter into one "if they are awarded the bid." Even then no partnership could arise until the necessary asset was acquired, i. e., until the contract and bond were executed and accepted by the government. Then the contract between the government and the parties became consummated, then the partnership became formed, and then it became the duty of the respective parties to supply their proportion of the capital. Plaintiff contends that the payment of capital was not a condition precedent to the formation of the partnership, but rather a condition subsequent. That may be true enough, but a contribution of "the necessary capital" was a necessary condition to the launching of the partnership. And the furnishing of capital was sine qua non to the performance of the government contract, and not a condition subsequent. The promises of the parties were mutual promises, the promise of the one being the consideration for the promise of the other; the "conditions" were concurrent, not independent. And either some contribution to capital is a condition to the right to claim profits, or the plaintiff's promise signifies nothing.

Plaintiff also ardently contends that the defendants had no legal right or power to expel him from the partnership or joint adventure, or to dissolve the partnership relation, and therefore he continued to be a copartner all the time, and this notwithstanding his refusal to contribute any share of the capital, although urgently and repeatedly requested to do so. The answer is that the plaintiff "expelled" himself by abandonment of the enterprise; that, far from desiring to expel or exclude him, it is evident that the defendants wished to keep him in the firm by making repeated demands that he should fulfill a fundamental obligation of the agreement, viz., that he must pay his share of the capital, and by giving him ample time and opportunity to perform his promises. But it is insisted that the only way in which the plaintiff could be got rid of was by instituting a suit against him, praying for a dissolution of the partnership and an accounting. In the meantime the partnership relation would be continuing, the defendants supplying all the capital, and it is likely that the partnership would have terminated by the time a final decree was rendered, by the fulfillment of the purposes for which it was formed. In such action there would be nothing to account for; the court would be limited to a bare declaration or adjudication that the plaintiff had, by repudiating his obligation,

abandoned the partnership. Why may not the court make such a determination now? Why may not the court now declare and adjudge that the defendants had, during all these times, a good and continuing cause for dissolution?

Really it makes no difference, in this case, whether or not the acts of the defendants constituted a dissolution of the partnership in a technical sense; but the question is whether, after the partnership has expired, a copartner, who has paid nothing, is entitled to share in the profits earned by the others. There is but one answer to that.

The plaintiff might have brought a suit to establish the partnership and for an accounting after his expulsion. Lord v. Hull, 178 N. Y. 9, 70 N. E. 69, 102 Am. St. Rep. 484. But his remedy was not confined to an accounting in equity. He could bring a suit at law claiming damages on account of the expulsion and attempted dissolution of the firm, and might be allowed prospective profits. Bagley v. Smith, 10 N. Y. 489, 61 Am. Dec. 756; Hagenaers v. Herbst, 30 App. Div. 547, 549, 52 N. Y. Supp. 360, affirmed on opinion below, 164 N. Y. 603, 58 N. E. 1088; Karrick v. Hannaman, 168 U. S. 335, 337, 18 Sup. Ct. 135, 42 L. Ed. 484.

But, of course, he could not have maintained either suit, for it is a settled rule of law that neither party to a contract can enforce it against the other without showing performance, or an offer or willingness and readiness to perform on his part. The same rule prevails in equity. A party who seeks to enforce a contract must show performance or its equivalent on his part before he becomes entitled to relief. Martin v. Johnston, 6 Misc. Rep. 314, 26 N. Y. Supp. 1105.

"A court of equity, doubtless, will not assist the partner breaking his contract to procure a dissolution of the partnership, because, upon familiar principles, a partner who has not fully and fairly performed the partnership agreement has no standing in a court of equity to enforce any rights under the agreements." Karrick v. Hannaman, 168 U. S. 335, 18 Sup. Ct. 135, 42 L. Ed. 484.

And, besides, the plaintiff could not show any wrongful breach of the partnership contract; but, on the contrary, it would appear that defendants had good and sufficient legal cause to exclude him from the business and to deny him any share of the profits that might accrue in the future. It would appear that they did not assume to dissolve the partnership from mere caprice or of their own volition, without cause, with a view to appropriate the business to themselves, but because of his utter repudiation of his obligation to contribute his share of the capital.

It is true that a copartner cannot, of his own motion, treat the partnership as ended and take to himself all the benefits of their joint labors and joint property, or exempt him from responsibility to account to the excluded partner. And, "even if the partnership should be considered as having been actually dissolved at that date, yet the dissolution did not put an end to the plaintiff's right to his share in the property and profits of the partnership." 168 U. S. 336, 337, 18 Sup. Ct. 139, 42 L. Ed. 484. But here it appears that the plaintiff has no such right. Since, therefore, the plaintiff never had a cause of action,

in law or in equity, during the continuance of the partnership, how can it be that he has a cause of action now?

In Slenmer's Appeal, 58 Pa. 168, 176, 98 Am. Dec. 255, held that one partner may at any time withdraw and cause a technical dissolution of the firm, subject to liability to his partner if the act be wrongful. In Reiter v. Morton, 96 Pa. 229, the defendant alleged as a cause justifying him in dissolving the partnership that, in an emergency, when additional capital was required to be paid in, the plaintiff failed to pay his proportion. And it was held that plaintiff must prove that he himself performed the covenants on his part, and that the defendant, without cause, failed to perform his. The court said:

"If a partner dissolves the contract for good cause, he has a lawful right to do so. The technical breach is no breach at all. To show a breach which entitled plaintiff to recover damages he must show a wrongful breach."

"Of course, if a partner dissolves the partnership before the expiration of the agreed term, he will be liable in damages to his copartner for breach of contract, unless he had a valid legal excuse for not performing his contract." 22 Amer. & Eng. Encyc. 206.

In McMullen v. Hoffman (C. C.) 75 Fed. 548, 551, two contractors by a joint bid secured a contract to construct a pipe line. McMullen wholly failed to contribute his share or any share, above a plant valued at $2,000, to the work being carried on, although he was repeatedly and urgently requested to contribute. There was a large profit, and plaintiff was held entitled to his share of it. But the court observed:

"There was such an entire failure on McMullen's part to fulfill his obligations in the contract that Hoffman would, in my judgment, have been justified in treating the contract as abandoned by McMullen; and this was threatened. It is only from the fact that Hoffman continued to recognize McMullen's relation in the business, by regularly charging for his own services, that I am justified in treating the partnership relation as having continued. The entire burden was upon Hoffman, and it involved not only the conduct of the business of constructing the work, but all the money responsibility that attached to it."

And therefore the court held that Hoffman was justified in crediting himself with $1,000 per month as salary. Reversed on the ground that the contract was tainted with illegality, and therefore the plaintiff could recover nothing. Hoffman v. McMullen, 83 Fed. 372, 28 C. C. A. 178, 45 L. R. A. 410; McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117.

The plaintiff calls attention to certain decisions that in his judgment appear to "crawl on all fours" in his direction. The idea seems more fanciful than real.

In Campbell v. Sherman, 55 Hun, 609, 8 N. Y. Supp. 630, the plaintiff's testator contributed his services, for which he was to receive a share of the profits. Defendants treated him as an employé and wrongfully discharged him.

In Aikin v. Luce, 63 Hun, 632, 18 N. Y. Supp. 392, the plaintiff claimed that he was entitled to all the proceeds of the joint adventure because the defendant failed to pay his contribution. But the defendant refused to contribute any part of the capital, basing his claim upon a denial of any obligation so to do. The court said that the only right which such refusal, if unjustifiable, conferred upon plain-

tiff, was to refuse to go on with the adventure, and to terminate the relations under the agreement between them; but, the plaintiff having availed himself of the defendant's services in procuring the contracts which formed the subject-matter of the joint adventure, he cannot now, because of his failure to contribute his proportion of the capital required, deprive defendant of a share of the profits.

But here there are points of difference: The plaintiff by bringing suit for a judicial settlement of the adventure in above case recognized the relationship as continuing. It does not appear that the plaintiff there was a party to the contracts procured by defendant, and, if not, he was at liberty to refuse to go on. The defendant always denied any obligation to contribute, but Westwood always admitted his obligation, and these defendants could not decline to go on and perform the government contract without subjecting themselves to liability in damages. The defendant in the Aikin Case, it seems, honestly believed and understood that the contracts procured and services to be rendered were to constitute his sole contribution. The facts and circumstances are not sufficiently set forth in the report of the Aikin Case.

In Hartman v. Woehr, 18 N. J. Eq. 383, it is held that the parties cannot exclude one of their number who has failed to pay in part of the amount which he agreed to contribute as his share of the capital; but if part of his capital has been paid in, accepted, and used, and the business has been commenced in the name of the firm, he is a partner until the partnership is legally dissolved. There, the plaintiff contributed $5,667 of his share of $10,000, by conveying an interest in his brewery property, for the use of the firm in the business of brewing.

In Boyd v. Mynatt, 4 Ala. 79, the plaintiff paid in $229 of his share of $1,000, and the business was carried on for more than a year. It does not appear whether the partnership was for a fixed period, or for a particular purpose which had been accomplished. The case of Featherstoneaugh v. Fenwick, 17 Vesey, 299, simply holds that a partnership for an indefinite period may be dissolved at any time, without previous notice, but a partner continuing to trade with the joint property, after dissolution, must account for the profits. The case of Clarke v. Hart, 6 Ho. L. Cas. 632, merely holds that a joint-stock company has no power to forfeit shares for nonpayment of calls. 1 Cook, Stockh. § 123.

It may be remarked here that the defendants could not, after having rescinded the agreement, hold the plaintiff for losses, if any had occurred, and, if he had been held liable to creditors, the defendants would be bound to make it good.

It appears that the defendants had purchased a large quantity of goods and chattels with their own funds, and that they took out a policy of insurance in their own name. The policy was taken out on October 10, 1907, and a loss by fire occurred on November 6th. For the reasons heretofore stated, the plaintiff has no claim to any part of the insurance moneys.

Findings may be submitted in accordance with the views herein expressed.