Domenick **FALCONI**, Plaintiff,

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION**, Defendant.

Civ. A. No. 12555.

United States District Court
W. D. Pennsylvania.

July 29, 1957.

4. See Employers Reinsurance Corp. v. Bryant, 299 U.S. 374, 57 S.Ct. 273, 81 L.Ed. 289.

Adolph L. Zeman, Washington, Pa., for plaintiff.

Shrum, Harrison & Craig, Pittsburgh, Pa., Royal L. Coburn, Gen. Counsel, Federal Deposit Ins. Corp., Washington, D. C., for defendant.

WILLSON, District Judge.

In this civil action tried to a jury, the verdict was for the plaintiff. Plaintiff sued to recover the sum of $19,265.-70 with interest. The verdict was in the even sum of $21,000, on which judgment was entered. During the course of the trial, at the close of plaintiff's evidence, defendant moved for a directed verdict and again at the close of all the evidence. The decision on both motions was reserved. After judgment was entered, defendant then filed and has pending the usual motions for a new trial and for judgment n. o. v.

Plaintiff is Domenick Falconi, a resident of Washington County in this district. The defendant Federal Deposit Insurance Corporation is organized and existing under an Act of Congress. 12 U.S.C.A. §§ 1811–1831. The First National Bank of Cecil, Pennsylvania had been a national bank organized and existing under the laws of the United States. On Monday, September 25, 1950, before the bank opened for business, John F. Wagner, for many years its executive vice-president and cashier, ended his life in front of the bank's vault by shooting himself. Following Wagner's suicide, the directors of the bank met, determined that the bank was insolvent, and called upon the Federal Deposit Insurance Corporation for aid.

The Federal Deposit Insurance Corporation, in accordance with the purposes for which it was incorporated, entered into an agreement with the insolvent Cecil Bank and the First National Bank of McDonald, Pennsylvania, a nearby town, wherein the McDonald Bank assumed all of the deposit liabilities of the Cecil Bank and the Federal Deposit Insurance Corporation agreed to provide the McDonald Bank with the necessary funds to make it whole. The Federal Deposit Insurance Corporation made an initial advance to the McDonald Bank

in the sum of $800,000; however, in the course of the liquidation of the affairs of the Cecil Bank, Federal Deposit Insurance Corporation was required to advance more than $1,700,000 to make good the Cecil Bank's deposit liabilities. The defendant found the affairs of the Cecil Bank in a great state of confusion. Important papers were found in packing boxes and deposit tickets and documents were found under desk blotters. Many irregular instruments were found on the premises, including checks drawn on other banks and signed with various names as purported drawers, but otherwise blank, and promissory notes purportedly signed by various makers but otherwise in blank.

During the liquidation of the Cecil Bank, many customers submitted proof that they had made deposits which were not reflected on the books of the bank and these and the many other irregularities which were disclosed subsequent to the McDonald Bank taking over were traced to the activities of John F. Wagner.

Plaintiff's claim is based upon a transaction involving two checks which plaintiff says Wagner used for the benefit of the bank on September 19, 1950. These were checks signed in blank by plaintiff and left with Wagner. Both checks were drawn on the First National Bank, Canonsburg, Pennsylvania. One check was dated September 19, 1950. This was made to the order of Joe Minehart in the sum of $9,265.70. The other check was dated September 21, 1950, and made payable to the First National Bank of Cecil in the sum of $10,000. The issue in the case is simply whether the transaction involving these checks and three other checks mentioned by Wagner to the plaintiff in their conversation of September 19, are part and parcel of a conceded check kite; or whether, as contended by plaintiff, John F. Wagner, the executive officer of the bank, without authority from the plaintiff, drew these checks on plaintiff's account and for the benefit of the bank.

A significant feature of this case and which the record shows, is that there is really very little of a factual controversy. What was done by the plaintiff and Wagner is not disputed to any great extent. However, the legal effect of their acts is the subject of controversy.

Another peculiar feature of the case is that both litigants stress the fact that the Cecil Bank was a one-man organization, operated by Wagner in a loose and careless manner and that Wagner was most accommodating to his friends and customers of the bank. There were but two other employees besides Wagner. Plaintiff conceded that prior to the dates in issue here, he had for a period of at least twenty-three months prior to Wagner's death, participated in a check kite involving over a million dollars and involving many, many transactions. Plaintiff's case is based on the proposition that he trusted Wagner as his friend and financial advisor, but that Wagner in the end used plaintiff's account for the benefit of the bank.

Plaintiff was a farmer, residing in Canonsburg, a town some eight miles from Cecil. In addition to farming, plaintiff was a livestock dealer, real estate dealer and beer distributor. During the period discussed here, plaintiff's principal banking connection was with the Cecil Bank, in which he carried six or seven accounts aggregating in deposits some $60,000 to $70,000. Plaintiff also had an account in the First National Bank of Canonsburg, but this was a relatively small account with a balance of from $1,000 to $1,500. On many occasions, plaintiff left with Wagner at the Cecil Bank, checks drawn on plaintiff's account in the Canonsburg Bank, which checks were signed by the plaintiff but otherwise blank. Plaintiff's testimony was that the practice grew up because he was involved in cattle deals and other transactions which required use of bank credit at various times and that Wagner accommodated him in that manner by creating credit at the Cecil Bank with the checks drawn on plaintiff's account at the Canonsburg Bank. Plaintiff readily conceded that he

filled in a great many of the check forms on the Cecil Bank by writing in his own name as payee, filling in the date and also writing in a name other than his own as the purported maker of the check. On many occasions he made out checks using names of relatives or other persons, without telling these people what he had done. Among the names which the plaintiff wrote in as the purported makers of these checks were: Lentie Rosconi, A. P. Richere, P. T. Santissi, Pietro Quardiere, Pietro Rosconi and Rosconi Pietro. Twenty-nine of these so-called "manufactured" checks were admitted in evidence upon stipulation of plaintiff's counsel that in each instance the name of the purported maker of the check was actually written in by the plaintiff. Wagner also made out similar checks, filling in a date and an amount and also writing in various names as the purported makers.

The manner of the operation of the kite by plaintiff and Wagner was substantially as follows: Checks on the Canonsburg Bank were used at the Cecil Bank. To cover these checks when they had cleared through banking channels and had reached the Canonsburg Bank, checks on the Cecil Bank were deposited at the Canonsburg Bank. The Cecil Bank's correspondent in Pittsburgh was the Farmers National Bank, to which the Cecil Bank remitted regularly. It took about five days for the checks to clear and reach the Canonsburg Bank. The Canonsburg Bank cleared through the Union National Bank at Pittsburgh. The latter bank in turn sent checks it received from the Canonsburg Bank to the Pittsburgh Branch of the Federal Reserve Bank, which in turn sent checks drawn on the Cecil Bank which had been deposited at the Canonsburg Bank, to the Cecil Bank in its regular remittance letters for payment. Usually, before the day a check was calculated to reach the Canonsburg Bank, plaintiff or Wagner would deposit in the Canonsburg Bank a manufactured check drawn on the Cecil Bank. Again it would take a few days for this covering check to reach

the Cecil Bank on which it was drawn, but when it did reach the Cecil Bank, Wagner would cover it with another of plaintiff's signed checks drawn on the Canonsburg Bank. Plaintiff testified that checks cleared in a volume of over $100,000 in some seven or eight weeks in the described method. He testified that the withdrawals from his Canonsburg account were in approximately the same amounts as were the checks, the body of which were filled in by Wagner, although the checks themselves were actually signed by him. What has been said here is a brief summary of the evidence in the case as to the kiting transactions prior to September 19, 1950. As to the kite prior to that date, there was simply no dispute between plaintiff and the defendant.

■ In the early stages of this litigation, the defendant sought summary judgment in its favor, based on plaintiff's testimony taken on deposition, showing the same check kite which plaintiff acknowledged that he participated in with Wagner. However, the motion was denied, because of plaintiff's factual allegation that the transaction involving the two checks at issue here took place after the kite had terminated and was separate and apart from the prior course of action. As mentioned, at the close of plaintiff's evidence and also at the close of all of the evidence, decision was reserved on defendant's motion for a directed verdict. It is now my conviction that upon all of the evidence there was no jury issue, and decision having been reserved on the motions for a directed verdict, judgment n. o. v. must now be entered. It is my view that there are no controverted issues of fact in this case upon which reasonable men could differ. Nevertheless, the jury did find for the plaintiff. Under the circumstances, it is necessary that the court correct the error.

It is my view that upon the facts and inferences to be drawn therefrom, supported by the overwhelming weight of the evidence, the case is so strongly in favor of the defendant that the jury

should not have reached a contrary conclusion. The underlying principle is familiar. Moore says, Vol. 5, page 2314:

"* * * a verdict will normally be directed where both the facts and the inferences to be drawn therefrom, as supported by the overwhelming weight of the evidence, point so strongly in favor of one party or the other that the court feels reasonable men could not possibly come to a contrary conclusion."

He continues, page 2315:

"In other words, where the evidence is such that without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict, the court should determine the proceeding by nonsuit, directed verdict or judgment n. o. v."

Federal law is applicable in this case, 12 U.S.C.A. § 1819, Fourth, which provides that "* * * All suits of a civil nature * * * to which the Corporation shall be a party shall be deemed to arise under the laws of the United States: * * *."

Consideration has been given to the familiar and cardinal rules in determining whether judgment n. o. v. should be entered. The rule is well established that a motion for judgment n. o. v. presents only a question of law as to whether, when all the evidence is considered together with all reasonable inferences in favor of plaintiff, there is a total failure or lack of evidence to prove any necessary element of plaintiff's case. Willits v. Yellow Cab Co., 7 Cir., 214 F.2d 612, at page 615.

On review of the evidence in this case it is my view that there is a complete absence of probative facts to support the jury verdict. Therefore, there was no room in this case for a jury to exercise its sole and exclusive function to evaluate the credibility of witnesses and from the entire evidence select that which it believed or which it relied upon. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Hobart v. O'Brien, 1 Cir., 243 F.2d 735.

We now reach a point in this discussion wherein the factual issues are disputed, plaintiff contending, of course, that a jury issue was presented and defendant contending to the contrary.

Defendant says that there are three questions involved in its motion.

(1) Has the plaintiff established that Cecil Bank was unjustly enriched at the expense of the plaintiff?

(2) Has the plaintiff established that he was dealing with the Cecil Bank in the matters here involved rather than with John F. Wagner individually?

(3) Has the plaintiff established that John F. Wagner's unlawful acts in the matters here involved were within his real or apparent authority as an employee of the Cecil Bank?

It is my view that all three questions must be answered in the negative. Viewed in the light most favorable to the plaintiff, on the disputed issues the evidence shows that on September 19, 1950, plaintiff met Wagner in the back room of the Cecil Bank. Wagner gave plaintiff three checks drawn on the Cecil Bank (Plaintiff's Exhibits 8, 9, and 10) and told plaintiff to deposit two of the checks to plaintiff's account at the Canonsburg Bank on Friday and the other one on Monday and at that time Wagner also gave plaintiff $65.70 in cash. The three checks were all payable to the order of the plaintiff and consisted of (1) a check purportedly drawn by the P. & J. Coal Mining Company for $10,000 (Exhibit 8); (2) a check purportedly drawn by Steve Spataro for $7,-400 (Exhibit 9); and (3) a check purportedly signed by John F. Wagner and drawn on his account for $1,800 (Exhibit 10). The checks with the cash of $65.70 aggregated $19,265.70.

At this same conversation, Wagner told the plaintiff that he had used two of the signed blank checks which the plaintiff had previously left with him. Later, plaintiff learned that these two

checks had been filled in by Wagner as follows: one to Joe Minehart in the sum of $9,265.70, which is Exhibit 1; and the other to the First National Bank in Cecil for $10,000, which is Exhibit 2; an aggregate of $19,265.70. The latter two checks are the subject matter of this suit. Plaintiff flatly says that these were unauthorized and for the benefit of the bank only and were made after any previous kiting had terminated and ended. The record shows that plaintiff did not owe the Cecil Bank any money on account of any of the previous kited checks on September 25, 1950, the day the bank closed. In fact, plaintiff had $69,070.40 credited to his various accounts in the Cecil Bank. The Federal Reserve Bank on Monday, September 25, 1950, in its regular course of business, credited the Cecil Bank with two items in an amount equal to the two checks, that is, one item in the amount of $9,265.70 and the other in the amount of $10,000. Thus the evidence is that the Cecil Bank got credit from the Federal Reserve Bank for the sum of $19,-265.70 and that in return for his two checks used by Wagner, the plaintiff received in exchange the three checks drawn on the Cecil Bank in the sum of $10,000, $7,400 and $1,800, aggregating $19,200, which were deposited by plaintiff at the Canonsburg Bank in accordance with instructions from Wagner, the first two on September 22 and the third on September 25, and these checks being unpaid on their reaching the Cecil Bank because the bank was then closed, plaintiff had to make them good at the Canonsburg Bank. All the transaction amounted to, according to plaintiff's testimony, was simply that Wagner gave him three "phoney" checks in return for dipping into his account in the amount of $19,265.70, being the aggregate of the two checks, plaintiff's Exhibits 1 and 2.

The liquidator for the Federal Deposit Insurance Corporation in charge of the Cecil Bank from the beginning and still in charge of its affairs, was J. C. Jacobsen. His testimony was that on two occasions prior to the trial, he had recommended to his superiors in Washington that plaintiff be paid his claim, based on the two checks in question. However, Jacobsen testified that as time passed, he was able to make a more careful investigation and came to the conclusion that the two checks in question simply were part of the check kite.

Plaintiff introduced into evidence Exhibit A in defendant's original motion to dismiss, which is a tabulation of a number of checks negotiated at the Cecil Bank and charged to Falconi's account at the Canonsburg Bank as against checks drawn on the Cecil Bank and deposited to Falconi's account at the Canonsburg Bank. This shows that on September 19, before the transaction in question, the kite was in balance. Plaintiff's own testimony was that the difference between the transaction mentioned and the previous transactions was that the transaction for which this suit was brought was for the benefit of the Cecil Bank and that the transactions prior to September 19 were for plaintiff's own benefit.

Defendant admitted at the trial and concedes that the three checks, Exhibits 8, 9 and 10, were not paid when they reached the Cecil Bank and that plaintiff finally made these checks good at the Canonsburg Bank where he had previously received credit for them. Defendant, of course, contends that the three checks were "phoney" checks, as all the previous checks in the kite operated by the plaintiff and Wagner had been, and that Wagner's suicide effectively prevented him from covering them with other "phoney" checks, as he had been doing for many months previously.

The evidence which has been reviewed and considered in a light most favorable to the plaintiff is not disputed by defendant. Defendant contends, however, that the evidence on the subject of the checks exonerates defendant rather than creates liability. A crucial point in the case, both at pretrial and during the trial, was the issue as to whether Wagner was acting for the benefit of the

bank or for plaintiff. At pretrial, plaintiff's counsel indicated that the evidence would be that plaintiff went to the bank of Cecil on Thursday and that John F. Wagner, the cashier and executive vice-president of the bank, told him that he had used checks of the plaintiff for the benefit of the bank, that is, " * * * he had used money from the account of the plaintiff to better the cash position of the bank. * * * "

Plaintiff's counsel recognized that the foregoing was an essential part of the plaintiff's case. However, defendant's counsel points to the testimony of the plaintiff on the crucial point. Defendant says that *plaintiff did not so testify*. On this phase of the case, plaintiff's testimony on direct was as follows:

Page 9:

"Q. Did he (Wagner) tell you why he drew these two checks to your account? A. I no recall what he told me, Mr. Zeman. I no recall what he told me. All he told me he use my two checks and these two checks they pay. * * * "

Page 10:

"Q. Did you make or authorize John Wagner to draw a check on your account to the First National Bank in Cecil for $10,000? A. No, I never asked him. He no ask me. * * * "

Page 12:

"Q. When John Wagner wrote these two checks without any authority from you and gave you these other checks did you object or what did you say to him? A. I said nothing.

"Q. Why didn't you? A. Well, he wrote them. Even if I wanted to say anything, it was too late. * * * "

Page 14:

"Q. Did John F. Wagner owe you $1800 at that time? A. No. He owe me on account the check he wrote on my account."

Again, plaintiff's contention is that Wagner acted without his knowledge or authority in drawing the Joe Minehart check, dated September 19, 1950, in the sum of $9,265.70, Exhibit 1, and the check to the Cecil Bank, dated September 21, 1950, in the even amount of $10,000. Plaintiff contends that by that date the check kite was over; that these two checks were separate, distinct and apart from any previous check kite. However, the various bank records simply overwhelm plaintiff's oral testimony on that subject. It appears that as soon as the liquidator found the time, a painstaking investigation was made of Pittsburgh and Federal Reserve Bank records and the records of the Canonsburg Bank, in addition to what was discovered at the Cecil Bank. Many of the bank records were on microfilm. The films were run through a viewer and the checks in the Domenick Falconi transactions were marked. Photographs were then made of the particular films showing the Falconi checks and also the incoming cash letters and outgoing remittance letters from corresponding banks. F.B.I. records and information were used in sifting the items. There was no ledger sheet for the plaintiff at the First National Bank in Cecil. There was a ledger sheet for plaintiff, however, at the Canonsburg Bank. Various bank records mentioned by Mr. Jacobsen in his testimony conclusively show that the $10,000 check, Exhibit 1, was issued to pay for a $10,000 unrecorded cashier's check given by Wagner on the Cecil Bank to Angelo Falconi, nephew of the plaintiff. Again, it is to be noticed that plaintiff conceded that he used many names, relatives and even strangers, as the makers and as payees of various kited checks. The testimony of Mr. Jacobsen as to the $10,000 check is as follows:

(T. page 141)

"Q. In connection with your investigation, did you account for the $10,000 check from Domenick Falconi to the First National Bank in Cecil dated September 21, 1950, and here in suit? A. I did.

"Q. How do you account for that check? A. On September 13, 1950,

John F. Wagner issued an unrecorded cashier's check on Angelo Falconi, nephew of Domenick Falconi, for $10,000. It bears Number 2234. This check was cleared through the Union Title Trust Guaranty Company, and was paid by the First National Bank in Cecil. On the date the cashier's check was paid by the Cecil Bank, Cesare Falconi gave his check for $10,000 drawn on the Citizens Trust Company of Canonsburg payable to Falconi Brothers. In order to make Cesare Falconi's check of $10,000 good when it arrived at the Citizens Bank at Canonsburg, Phillip Falconi's check, son of Domenick Falconi, was issued in the amount of $10,000 and drawn on the Cecil Bank, deposited to Cesare's account at the Citizens Bank, Citizens Trust Company of Canonsburg. When Phillip Falconi's check for $10,000 reached the Cecil Bank, Domenick Falconi gave his check for $10,000 to the Cecil Bank drawn on the First National Bank at Canonsburg. When Domenick Falconi's check arrived at Canonsburg, in order to make a deposit in such amount to cover it, he deposited a check John Wagner gave him from the P. & J. Coal Company in the amount of $10,-000.

"Therefore the tracing is that the $10,000 check involved in this suit traces back to pay for the $10,000 cashier's check issued to *Domenick* Falconi. (Witness obviously meant Angelo Falconi as the recipient of the cashier's check.) It must be borne in mind this is an unrecorded cashier's check; there did not have to be put any money in the bank at the time it was issued, but there had to be something put in the bank to offset it when the bank paid it. In other words, when they issued their draft to pay for that $10,000 represented in the draft, it had to be offset by a $10,000 credit to the bank.

"Q. Then in the light of that tracing, was the Cecil Bank enriched by $10,000 when Domenick Falconi made good the P. & J. Coal Mining check which is connected with this suit? A. No, merely paid for the cashier's check originally issued."

Also, the witness Jacobsen testified in connection with the $7,400 and $1,800 checks here in suit, as follows:

(T. page 143)

"Q. Now in connection with your investigation, did you account for the check from Steve Spataro to Domenick Falconi for $7400 and here in suit, and the check from John F. Wagner to Domenick Falconi for $1800 that's here in suit? A. I did.

"Q. Will you please account for those checks? A. On September 15, 1950, Domenick Falconi gave his check to Falconi Brothers, which is Audit Exhibit B75 drawn on the First National Bank at Canonsburg, in the amount of $6464.50. When the check arrived at Canonsburg, in order to have sufficient funds in the bank to cover this check, Domenick Falconi on September 19, 1950, Domenick Falconi deposited a check of Lentre Rosconi for $4700, which check was included together with other items in a deposit of $6482.59. The Rosconi check was drawn to the First National Bank in Cecil and was a forgery.

"By the Court:

"Q. What do you mean when you say 'forgery' there? A. It wasn't signed by Rosconi. * * *"

(T. continued page 144)

"Q. Was there an account there in that man's name, the maker's name? A. Not that we could find.

"Q. Not an account in the maker's name that was used? A. No.

"(Colloquy by Court and Counsel)"

(T. continued page 147)

"Q. All right, Mr. Jacobsen, continue. A. Where did I leave off? On September 19, 1950, to cover the

check of Lentre Rosconi of $4700, when it arrived at the Cecil Bank in the Federal Reserve cash letter of September 20, 1950, Domenick Falconi gave the First National Bank in Cecil his check dated September 19, 1950 for $9265.70, which the Cecil Bank included in their remittance letter on September 20, 1950. This check of Domenick Falconi's was drawn on the First National Bank in Canonsburg, was payable to Joe Minehart, and was credited to Domenick's account. Therefore, the $9265.70 check was used to cover the $4700 Lentre Rosconi check. What Mr. Falconi received for the difference between $4700 and $9265.70, there is no record of.

"On September 22, 1950, when the Domenick Falconi check for $9265.-70 arrived at the First National Bank in Canonsburg, there were not enough funds to cover, therefore Domenick Falconi made a deposit of $9279.43 to cover this check. The deposit totalling $9279.43 consisted of $65 currency, an item of $14.43, an item of $1800, and an item of $7400. The last two items are the checks drawn on the First National Bank at Cecil as follows: one, $1800 check dated September 20, 1950 drawn by John F. Wagner, and is part of this suit; 2, the $7400 check dated 9–21–50 was drawn by the P. & J. Coal Mining Company payable to Domenick Falconi and is a part of this suit.

"From this, we traced the two checks, the $1800 check and the $7400 check back, and it was used in part to take up the $4700 Lentre Rosconi check. Mr. Falconi admits it was for his benefit.

"Q. Now in your opinion then, and from your investigation, is it your opinion that the Cecil Bank or the F.D.I.C. was unjustly enriched as a result of Mr. Falconi's paying these two checks at the Cannonsburg Bank? A. No.

"Q. And in your opinion was Mr. Falconi unjustly deprived of the money with which he paid for these two checks? A. No.

"Q. Why not? A. Because you trace them right back to that $4700 check. Now as I stated before, I don't know what the difference is between the $4700 and the check that was given; that I can't explain, but $4700 of it definitely is."

From what has been said, the query is: Was there an issue of fact for the jury to resolve? This court concludes that there was not. Defendant's evidence makes it crystal clear that the checks sued on were part and parcel of the kite, plaintiff's protestations to the contrary notwithstanding. Jacobsen's conclusions are backed by the hard and carefully sifted and examined impartial records of the banks through which the subject checks circulated. Those records show a continuous check kite until the suicide of Wagner. Kiting checks is an illegal transaction in violation of the banking laws. 18 U.S.C.A. § 656. See United States v. Matsinger, 3 Cir., 191 F.2d 1014.

Returning to the defendant's first proposition, Has the plaintiff established that Cecil Bank was unjustly enriched at the expense of the plaintiff? The overwhelming evidence requires that the answer be in the negative. Wagner provided plaintiff with a false credit. When plaintiff was required to make good the three checks at the Canonsburg Bank after Wagner's suicide, he was simply paying for the credit illegally extended to him by Wagner. It is true that plaintiff offered Angelo Falconi, his nephew, to testify that in exchange for the $10,-000 cashier's check, he gave Wagner $10,-000 in cash. As with plaintiff's oral testimony, this testimony of Angelo Falconi simply cannot stand in the face of the documentary proof. His statement with regard to the cashier's check is simply imaginary or else perjurious.

For instance, plaintiff's main contention is that the check of September 21, 1950 in the sum of $10,000 signed by

him, on which the Cecil Bank was payee and which Wagner put through, and for which the Cecil Bank was given credit by the Federal Reserve Bank, was unauthorized dipping into his account by his friend Wagner for the benefit of the bank. The documentary proof, however, is inconsistent and to the contrary. It must be emphasized that plaintiff used many names in the check kite transactions. The checks which floated between the two banks after the cashier's check of September 13, 1950 was given to Angelo Falconi, were purportedly signed, the first by Cesare Falconi and the second by Phillip Falconi. The check mentioned by Wagner at the September 19 conference, dated September 21, 1950, reimbursed the Cecil Bank for Angelo's cashier's check. Both Wagner and Falconi knew this was a "phoney" check and to make it good at the Canonsburg Bank on which it was drawn, Wagner instructed plaintiff to deposit the P. & J. Coal Mining Company check in the sum of $10,000. Thus, when plaintiff walked out of the Cecil Bank on September 19, 1950 with the three checks, Exhibits 8, 9 and 10, given to him by Wagner for deposit at the Canonsburg Bank, he was still carrying out a check kite. The P. & J. Coal Mining Company check in the sum of $10,000 was in fact deposited by plaintiff at the Canonsburg Bank on September 25, 1950, the other two having been deposited on September 22, in accordance with Wagner's instructions to plaintiff. Thus, the final step and the end of the kite occurred on September 25 at the Canonsburg Bank. Plaintiff's and Angelo Falconi's unsupported assertions cannot prevail over the documentary proof. See Sachs v. Ohio Nat. Life Ins. Co., 7 Cir., 148 F.2d 128, at page 131, 158 A.L.R. 688.

To discuss Angelo Falconi's testimony further, if he had given Wagner $10,000 in cash, then there was no need whatsoever for the remaining $10,000 checks shown by the uncontradicted records which were kept in due course by various banks. It is most significant that three names of plaintiff's family were used,

that is, Angelo, Cesare and Phillip Falconi, in the several floats which were put out to cover the cashier's check. Again, if Wagner had received $10,000 in cash, then plaintiff knew he was embezzling the money and in that event he was *particeps criminis* to the embezzlement and cannot use the cashier's check as the basis for recovery against the defendant.

■■ Plaintiff having engaged in a criminal venture with Wagner, he is entitled to no relief in this court. The general proposition is that the courts leave ill-doers where they find them. As early as 1818, in the case of Seidenbender v. Charles, 4 Serg. & R., Pa., 151, Chief Justice Tilghman of Pennsylvania said:

"* * * I consider it a perfectly settled proposition that an action cannot be sustained, founded on a transaction prohibited by Statute, although it be not expressly declared that the contract is void."

And, in McMullen v. Hoffman, 174 U.S. 639, at page 654, 19 S.Ct. 839, at page 845, 43 L.Ed. 1117, the court said:

"The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it, nor will they enforce any alleged rights directly springing from such contract. In cases of this kind the maxim is, '*Potior est conditio defendentis.*'"

■ The law is settled that neither an illegal contract nor any other transaction arising from illegality can be the basis of a successful cause of action. The law turns a deaf ear to a litigant founding his claim for relief upon an act which the law has condemned as being unlawful. Numerous cases can be cited in support of the foregoing proposition. See Speise v. McCoy, 6 Watts & S., Pa., 485; Dippel v. Brunozzi, 365 Pa. 264, 74

A.2d 112; McMullen v. Hoffman, supra; Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293; Warner Bros. Theaters v. Cooper Foundation, 10 Cir., 189 F.2d 825; and Restatement of the Law, Restitution, Chap. 8, Sec. 140.

■ As to defendant's second and third questions mentioned heretofore, it is apparent that no further discussion is needed. Wagner was a conceded embezzler. He was engaged in unlawful acts. With Wagner, plaintiff had kited hundreds of checks. Plaintiff must be held to have dealt with John F. Wagner individually, and the record is bare of any evidence that Wagner's unlawful acts in the matters here involved were within his real or apparent authority as an employee or officer of the Cecil Bank. Federal Deposit Ins. Corp. v. Pendleton, D.C., 29 F.Supp. 779.

### Motion for a New Trial

Consideration should be given to the motion for a new trial in the event that judgment n. o. v. does not prevail. It is my view as trial judge, that the verdict is against the weight of the credible evidence and that a grave injustice has been done the defendant by the jury's verdict. As mentioned heretofore, the testimony of Angelo Falconi as to the $10,000 in cash is against the overwhelming weight of the evidence.

■ Another point is appropriate to mention in the event of a new trial. The pretrial conference was held on January 29, 1957. At that time the decision of the Court of Appeals of this circuit, Masters v. Commissioner, had not been decided. See 243 F.2d 335. George R. Craig, Esq., representing defendant, mentioned plaintiff's pleas of nolle con-

tendere and sentence on two indictments, Nos. 13753 and 13754, in this court. The one charged Falconi with violation of 18 U.S.C. § 1341, using the mails in the execution of a scheme to defraud, and the other charged Falconi with misapplying moneys, funds and credits of a national bank, 18 U.S.C. § 656. Both indictments, the second one especially, relate to the check kite engaged in by plaintiff with Wagner at this same bank. When Mr. Craig suggested that convictions might be used in the trial of the case for the purpose of affecting plaintiff's credibility in the event he testified, Mr. Zeman and the court indicated that such proof was inadmissible because the plea was nolle contendere. This was error in the light of the Masters case and of itself is no doubt sufficient to require a new trial.

One further comment suggests itself as appropriate. How did it happen that the jury failed to accept what has been characterized in this discussion as crystal clear evidence? No doubt one reason was the fact that the evidence as to the check kite which was introduced by the defendant was most complicated and difficult for a jury to follow and understand. In reading the trial record one is struck by the fact that plaintiff and Wagner were most adept at covering one "phoney" check with another. Such evidence is hard to make clear to the lay mind. Most likely, also, the fact that Mr. Jacobsen had twice recommended payment to plaintiff had a strong influence on the jury's finding for plaintiff. Plaintiff's counsel is a most persuasive trial lawyer and he made the most of the two recommendations. Nevertheless, the trial record requires a new trial in the event that the judgment n. o. v. does not prevail.